## PEOPLE v. LEWIS.

*(Supreme Court, General Term, First Department.* December 31, 1891.)

1. LARCENY BY FALSE PRETENSES—PROOF OF NEGATIVE.

On a trial for larceny by obtaining money under false pretenses, the prosecution proved without contradiction that defendant had obtained $5,500 from the prosecuting witness by representing to her that he had expended over $1,600 for her in purchasing stock on installments, and that the $5,500 was needed for a further payment; that he afterwards told her that he had purchased it, and that it stood on the books of the company in her name, and pretended to pay her the dividends upon it; that no such stock had ever stood in her name on the company's books, and that defendant, when informed of this fact, made no explanation, but admitted that his previous statement was false, and said that "the money" was gone; and that he had obtained another larger sum from her, for which he had given her worthless bonds of a corporation without assets. *Held*, that this evidence fully warranted the conclusion that defendant had never bought the stock, and it was not error to submit the case to the jury.

2. WITNESS—CONFIDENTIAL COMMUNICATIONS BETWEEN HUSBAND AND WIFE.

Voluntary testimony by a wife in a criminal prosecution of her husband as to statements made by him to her in presence of a third party is not a compulsory disclosure, nor are the communications confidential, within the meaning of Pen. Code, § 715, providing that on the trial of a person indicted for a crime the, husband or wife of such person cannot be compelled to disclose a confidential communication made by one to the other during marriage.

3. LARCENY BY FALSE PRETENSES—ADMISSIBILITY OF EVIDENCE—ERROR NOT PREJUDICIAL.

On a trial for larceny by obtaining money under false pretenses, it appeared that about the time of the alleged larceny defendant induced the prosecuting witness to invest another sum of money in bonds, which she was afterwards informed by letters were worthless, and that she showed the letters to defendant, who refused an explanation. *Held*, that the reading in evidence of the letters by the prosecution, after their substance had been brought out by defendant's counsel on cross-examination of the prosecuting witness, did not prejudice defendant, and was not ground for reversal of a conviction.

4. SAME—EVIDENCE OF INTENT—SIMILAR TRANSACTIONS.

Such letters were competent evidence as part of the *res gestœ*, as the prosecution, to prove the intent of defendant in the transaction, might show that he had obtained other money from the prosecuting witness upon similar pretenses made with reference to other securities. The letters were admissible for the purpose of laying a foundation for proof of what defendant did and said when their contents were communicated to him. It was not necessary to prove the signature of the writer, or that the statements made in them were true; nor could defendant object to their admission on the ground that he was not called upon, by the communication of the contents of the letters to him, to make any statement.

Appeal from court of general sessions, New York county.

Trial of an indictment against Samuel W. Lewis for larceny in obtaining money under false pretenses. On trial, the jury found a verdict of guilty of grand larceny in the first decree. From the judgment of conviction entered upon the verdict, defendant appeals. Affirmed.

Argued before VAN BRUNT, P. J., and BARRETT and ANDREWS, JJ.

*Herbert W. Grindall*, for appellant. *De Lancey Nicoll*, Dist. Atty., (*Bartow S. Weeks*, of counsel,) for the People.

ANDREWS, J. The defendant was indicted for what formerly would have been the crime of obtaining money by false pretenses, but which, under the Penal Code, is now larceny. The substance of the charge set forth in the indictment was that the defendant on July 19, 1887, stole from one Alice° G. Bostwick the sum of $5,500 by means of a false and fraudulent pretense and representation that he had in the month previous purchased for her 100 shares of stock of the Pullman Palace-Car Company, and had arranged that the same should be paid for by her in installments; that he had made various payments on account of said purchase, amounting to over $1,600, and that it was then necessary that she should make a further payment on account of such purchase; that she, believing such false and fraudulent pretenses and represen-

tations, and being deceived thereby, gave the defendant $5,500, which money the defendant received and obtained with intent to deprive and defraud her of the same, and to appropriate the same to his own use; whereas, in truth, the defendant had never purchased for said Alice G. Bostwick any stock whatever of said company, and had not made any such agreements or payments as he stated; and it was not then necessary to make any further payments on account thereof. The jury convicted the defendant, and thereupon judgment was pronounced that he be imprisoned in the state-prison at hard labor for the term of seven years and six months, and from such judgment this appeal is taken.

The first point raised by the learned counsel for the defendant is that the court erred in refusing to take the case from the jury. We do not think that this point is well taken. On the contrary, we think the case is one which it was the plain duty of the court to submit to the jury. Alice G. Lewis, (formerly Alice G. Bostwick,) the wife of the defendant, and a number of other persons were called as witnesses, and testified on behalf of the people. The defendant himself did not go upon the witness stand, nor were any witnesses called in his behalf. The evidence given on behalf of the prosecution was substantially to the following effect: In May, 1887, Mrs. Bostwick had some money which she wished to invest, and the defendant, with whom she had previous acquaintance, represented to her that Pullman Palace-Car stock would be a very fine investment, and told her she could buy it on installments. Mrs. Bostwick consented that the defendant should buy 100 shares of that stock for her, and at different times gave him money to make payments on account of the purchase price. In the latter part of May, 1887, she gave him $150; on June 24th, $600; on June 24th, $700; on June 30th, $900; and on July 19th, $5,500. After she had given him some money, the defendant told her he would give her a statement that would show just how she stood. He also told her that the account for all the money she had given him was standing on the books of said company, and also on his book. On June 27th he told her that he had bought said 100 shares of Pullman Palace-Car stock, and that the stock was on the books of the company, and also on the books in his office. Mrs. Bostwick, after procuring a divorce from her former husband, was married to the defendant on December 27, 1887, and lived with him for about two years thereafter; and the expense of maintaining the household during that time appears to have been borne by her. While she was living with the defendant, he paid her $200 every three months, which he said was the interest upon said stock. In August, 1889, while the defendant and his wife were living at Orange, N. J., she, not having received such interest for some time, asked him for the same. The defendant thereupon gave his wife a letter to one Johnson, who was a friend of his, and who did business in New York city; and told his wife to come to New York, and deliver the letter to Johnson. This letter was put in evidence, and was in substance a letter introducing his wife to Johnson, stating that the defendant had been ill, and expressing the hope that Johnson would give his wife special assistance. Mrs. Lewis came to New York, and delivered the letter to Johnson, and had a conversation with him, which she afterwards repeated to her husband. The substance of such conversation was that Johnson told her he had nothing whatever to do with her affairs, and knew nothing about them. Mrs. Lewis then went to the office of the Pullman Car Company, and was referred to the office of the Farmers' Loan & Trust Company, where the transfer books of said car company were kept, and she there discovered that there was not then, and never had been, any stock of the Pullman Car Company standing in her name upon the books. She then returned to Orange, and, in the presence of her daughter, had an interview with the defendant, in which she told him the result of her visit to New York. Mrs. Lewis was very much prostrated, and said to the defendant, "Why have you sent me on this false errand?" The

defendant replied that he gave her the letter to Johnson because he wished to get rid of her, and get her out of the house, because he was afraid she might have him arrested. She told him about her visit to the office of the car company, and of the loan and trust company, and that there was no stock upon the books in her name. The defendant replied, "Yes;" he knew it; there never had been; and the money was gone. Mrs. Lewis asked him where the money had gone, and he replied, "Gone for anything, everything." The next day, Mrs. Lewis came to New York, and went to the house of Paton & Co., and made inquiries about various bonds which the defendant had purchased for her. The firm promised to make inquiries, and subsequently sent her two letters, the contents of which she communicated to her husband. These letters relate to the bonds of the New York, West Shore & Chicago Railroad, in which the defendant had induced Mrs. Lewis to invest the sum of $7,000. In one of these letters Paton & Co. stated that they had found that said bonds were absolutely worthless, and that the road had been foreclosed years before, for about $14,000, which went to cover the lawyer's fees. The testimony of Mrs. Lewis as to what occurred between her and her husband after the receipt of this letter is as follows: "After I got the reply, I showed it to Mr. Lewis. I told him I could not understand why he treated me in this manner, and I could not account for it at all. I wished he would make me some explanation. He would make no explanation at all, and treated me in a very cruel manner,—I mean, ignoring everything. I don't know—I cannot describe— the way the man appeared after my telling him that these houses found they were all false. I was forced to leave the house, because his conduct towards me was so brutal I could not stay there. He was up all night, racing through the house, frightening the servants, and coming into the room, and saying: 'Madam, are you going to leave the house? Will you go out of the house immediately?' giving me no rest and no sleep. * * * Mr. Lewis left my house at one o'clock in the morning. I never laid eyes on him since. At ten o'clock the next morning, with his clerk, Herbert Stewart, I left my own house with four servants, and went to my daughter. I could not stay in the house. He had told me to leave the house; I must get out. I went to a lawyer."

A statement prepared by the defendant himself, and given to Mrs. Lewis, was also put in evidence, which shows, as he told her, the property of hers which he had in his possession. This statement shows investments, or pretended investments, amounting to many thousands of dollars, besides the Pullman Palace-Car stock and the New York, West Shore & Chicago bonds above mentioned, but no evidence was introduced as to such other properties. As above stated, the defendant did not go upon the witness stand, and no witnesses were called in his behalf, and the evidence above detailed stood absolutely uncontradicted; and it also appeared that the defendant, while under arrest, attempted to escape by jumping from a railroad train which was in rapid motion. Under these circumstances, the claim of the learned counsel for the defendant that it was error for the court to submit the case to the jury is certainly rather startling, for no case was ever tried in a court of criminal jurisdiction which was more clearly one for the jury than this. It was doubtless necessary for the prosecution to prove beyond a reasonable doubt that the defendant had never purchased the Pullman Palace-Car stock. If he had in fact purchased it, and then sold it, and misappropriated the proceeds, he would not have been guilty as charged in the indictment. It was therefore necessary for the prosecution to prove a negative, and the only way in which this could be possibly done was by circumstantial evidence. The evidence was uncontradicted that the defendant had obtained the money upon the representation that he was going to buy such stock for her; that he afterwards told her that he had purchased it, and that it stood on the books of the company, and he pretended to pay her the dividends upon the stock;

that the defendant sent her on a useless trip to New York, in order to get her temporarily out of the way; that upon investigation it appeared that no such stock had ever stood in her name upon the books of the company; that when informed of this fact the defendant made no explanation whatever, but admitted that his previous statement that it stood upon the books of the company was false, and also said, not that the stocks were gone, but that the money was gone, clearly implying that he never had bought the stocks. And there was uncontradicted evidence bearing upon the question of the defendant's intent, which amounted to an admission by him that he had obtained $7,000 from his wife, for which he had given her worthless bonds in a corporation whose entire property had been sold for a small amount, under foreclosure, many years previously. It was clearly the duty of the court to submit the case to the jury. The evidence fully warranted the conclusion that the defendant had never bought such stock, and that he was guilty as charged in the indictment; and it would have been astonishing if, upon such evidence, the jury had failed to convict the defendant.

The second point made by defendant's counsel is that the court erred in allowing the wife's testimony as to the defendant's admissions to her. This point also is not well taken. Section 715 of the Penal Code is as follows: "The husband or wife of a person indicted or accused of a crime is in all cases a competent witness on the examination or trial of such person; but neither husband nor wife can be compelled to disclose a confidential communication made by one to the other during their marriage." Section 831 of the Code of Civil Procedure contains, among other things, the following provisions: "A husband or wife shall not be compelled to disclose a confidential communication made by one to the other during the marriage." Section 392 of the Code of Criminal Procedure is as follows: "The rules of evidence in civil cases are applicable also to criminal cases, except as otherwise provided in this Code:" The answer to the point raised by counsel is that, in the first place, the admissions made by the defendant to his wife were not "confidential communications." The wife had good reason to believe that her husband had stolen her money, and, in the presence of her daughter, she asked him for an explanation. There was nothing of a confidential character in his answers. He refused to explain, and merely declared that there never had been any stock standing in her name, and that the money was gone; and, after the disclosures contained in the letter of Paton & Co., he still refused to make any explanation, and by his cruel and brutal treatment drove his wife out of the house, which was maintained with her money. In the next place, even if such admissions were regarded as "confidential communications," the above-cited provision of the Code of Civil Procedure has no application, because section 715 of the Penal Code does otherwise provide. That section makes a husband and wife competent witnesses against each other when either is on trial for a crime. It merely declares that neither can be compelled to disclose a confidential communication made by one to the other during their marriage. There can be no pretense that Mrs. Lewis was compelled to disclose the admissions or statements made to her by her husband. On the other hand, she had every reason to voluntarily give the testimony which she did as to such statements and admissions, and it clearly appears from the record that her testimony was entirely voluntary.

The third point raised is that the letters of Paton & Co., heretofore referred to, were improperly admitted in evidence. We do not agree with counsel upon this point for several reasons. In the first place, the reading of the letters in evidence by the district attorney cannot have injured the defendant, because the substance of the letters had already been stated by Mrs. Lewis, while she was under cross-examination. Counsel for the defendant claims in his brief that such statement was not brought out by him, but was made in response to inquiries by the district attorney and the court. The

case on appeal, however, shows to the contrary, and we must be governed by that. It does appear that while Mrs. Lewis was being cross-examined the assistant district attorney and the court did ask certain questions, but, after those questions had been asked and answered, the counsel for the defendant proceeded with his cross-examination, and such testimony as to the contents of the letter must have been given, according to the record, in response to questions asked by him, though, as this part of the case is not made up by question and answer, the questions which elicited the testimony do not appear. Mrs. Lewis, after stating that she went to the house of Paton & Co., said: "I made some inquiries about some bonds, and came home to await their reply. The next day I received letters from the house of Paton & Co. that these bonds were worthless. After I got the reply I showed it to Mr. Lewis. I told him I could not understand at all why he treated me in this manner, and I could not account for it at all. I wished he would make me some explanation. He would make me no explanation at all, and treated me in a very cruel manner." Defendant's counsel certainly did not object to this testimony, and, as the record shows, it was brought out by him while Mrs. Lewis was under cross-examination. Defendant, therefore, could not have been prejudiced in any way by the fact that subsequently the letters themselves were admitted in evidence, and read. In the second place, even if the contents of the letters had not been so brought out on cross-examination, we think it would have been competent for the prosecution to have put the letters in evidence as part of the *res gestæ*. The charge in the indictment related to but one transaction,—that of the Pullman Palace-Car Company stock, —and that was the only crime, of course, of which the defendant could be convicted under the indictment. But to prove the intent with which the defendant acted in that transaction it was competent for the prosecution, if it could, to prove that the defendant had at about the same time defrauded his wife by obtaining money from her upon similar false pretenses, made with reference to other securities. The letters of Paton & Co. related to bonds of the New York, West Shore & Chicago Railroad, and it appears by his own written statement, rendered to his wife, that he had obtained $7,000 from her with which to buy these worthless bonds. After she received the letters from Paton & Co. she had an interview with her husband. She testified, as above stated, on cross-examination, that she showed the reply of Paton & Co. to the defendant. On her redirect examination she further testified that she showed both of the letters to the defendant, and, further on, that she communicated those letters to the defendant; and she also testified on such redirect examination that the defendant had previously told her that the said bonds were as good as gold, and that he paid her money which he said was the interest on those bonds, although, if the statements contained in the letters are true, the mortgage given to secure such bonds had been foreclosed, and the property of the railroad sold, many years before. It was competent for the prosecution to prove all that took place at that interview between Mrs. Lewis and her husband; and, as she showed him these letters, and communicated their contents to him, and then demanded an explanation, the prosecution had the right to read them in evidence. The counsel for the defendant thinks they were not competent evidence because the signature of Paton & Co. was not proved, and because no further evidence was offered that the statements contained in said letters were true; but we think the learned counsel misconceives the principle upon which the court acted in allowing the letters to be read, and the purpose for which the letters were put in evidence. Of course, even if the signature of Paton & Co. had been proved, the letters themselves were wholly inadmissible for the purpose of showing that the bonds in question were worthless, or that the road had been foreclosed, or for the purpose of showing any other fact stated in the letters. They were mere hearsay, and could not have been made competent evidence, for any

such purpose, by proof of their genuineness. They were admissible, however, for the purpose of laying a foundation for proof of what the defendant said and did when their contents were communicated to him.

Counsel for the defendant argues that, when the contents of the letter were communicated to the defendant, he was not called upon to make any statement, but we cannot agree to this proposition. He had obtained $7,000 from his wife, with which to buy these bonds, telling her they were as good as gold. She presented a letter, in which it was stated in substance that the bonds had been worthless for many years, and demanded an explanation. Surely, if there ever was a case which called for an explanation, this was one. Suppose that the wife at this interview had stated to the defendant that Paton & Co. had told her that the bonds were worthless, it would certainly have been competent in that case for the prosecution to prove that she made this statement to him, and to prove what he said in reply; or if he refused to give any explanation, or remained silent, to prove that fact. The rule applicable to such cases is laid down very clearly in *Kelley* v. *People*, 55 N. Y. 571: "Where an individual is charged with an offense, and declarations are made in his presence or hearing touching or affecting his guilt or innocence of an alleged crime, and he remains silent when it would be proper for him to speak, it is the province of the jury to interpret such silence, and determine whether his silence was, under the circumstances, excused or explained. At most, silence under such circumstances is but an implied acquiescence in the truth of the statements made by others, and thus presumptive evidence of guilt; and in some cases it may be slight, except as confirmed and corroborated by other circumstances. But it is some evidence, and therefore, excepting those cases where the statements are made upon an occasion and under circumstances in which the individual sought to be affected could not with propriety speak, as in the progress of a judicial investigation, or in a discussion between third persons not addressed to or intended to affect the accused, or induce any action in respect to him, so that for him to speak would be a manifest intrusion into a discourse to which he was not a party, the evidence is competent, and should be admitted." And, as was said in *Cohu* v. *Husson*, 113 N. Y. 662, 21 N. E. Rep. 703: "Silence when one ought to speak is often as significant as an express admission." The letters themselves prove nothing as to the truth of the statements therein contained, but the silence of the defendant, and his failure to make any explanation as to the matter, is presumptive evidence that the statements contained in the letters were true; and it was for the jury to determine what construction could be placed upon what was said and done by the defendant after the letters had been shown to him by his wife, and upon his failure to make any explanation. If the contents of those letters were true, he stood in the position of having deceived and defrauded his wife; and his refusal to make any explanation was some evidence of his guilt, and it was for the jury to say what weight should be attached to it in connection with the other evidence in the case. And if the evidence of what transpired at this interview, taken in connection with such other evidence, satisfied the jury that he had defrauded his wife in regard to the New York, West Shore & Chicago bonds, they had the right to take that fact into consideration in determining the intent with which he had acted in reference to the Pullman Palace-Car stock. We think the defendant had a fair trial; that none of the exceptions were well taken; that there is nothing which occurred at the trial that calls for a reversal; and that the judgment should be affirmed.

BARRETT, J., (*concurring.*) The only doubt here is as to the letters of Paton & Co. But a careful examination of the record shows that the contents of these letters were elicited by the defendant on his counsel's cross-examination of the prosecutrix. The redirect examination followed in its reg-

ular order. It is clear, therefore, that the defendant himself made the inquiry which resulted in the testimony that "the next day" the witness "received letters from the house of Paton & Co. that these bonds were worthless," and that the witness showed the particular letter in question to the defendant. Now, the letters contain nothing more than a statement that these bonds were worthless; consequently they added nothing to what the defendant had himself placed before the jury. They simply illustrated the conversation, and pointed out precisely what the defendant saw when the prosecutrix showed the letters to him. The other questions are free from doubt, and I concur in the opinion for affirmance.

VAN BRUNT, P. J., concurs.