THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ROBERT SANDERS, Defendant-Appellant.

First District (5th Division)   No. 80—2829

Opinion filed December 10, 1982.

2

Ralph Ruebner and Daniel D. Maynard, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Casimir J. Bartnik, and Mark R. Fuller, Assistant State's Attorneys, of counsel), for the People.

JUSTICE WILSON delivered the opinion of the court:

Following a jury trial, defendant was convicted of murder (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(a)(1)) and armed robbery (Ill. Rev. Stat. 1981, ch. 38, par. 18—2(a)) and was sentenced to prison terms of 50 and 30 years, to run concurrently. On appeal, he contends that: (1) the trial court's admission of his wife's testimony violated the husband-wife privilege; (2) the trial court failed to clarify questions from the jury and failed to provide the jury with a requested transcript of his wife's testimony; (3) the trial court failed to instruct the jury on lesser-included offenses and failed to give a proper instruction on circumstantial evidence; (4) the trial evidence was insufficient to support a verdict of guilty of murder; (5) statements made during the State's closing argument constituted reversible error; and (6) an investigation by the State's Attorney's office of the public defenders who were assigned to defendant's case, which resulted in a replacement of defense counsel, violated defendant's right to effective assistance of counsel and due process. We reverse and remand. The pertinent evidence follows.

Robert Sanders resided at the Boulevard Hotel, room 39, 2801 West Warren Street, Chicago. On October 13, 1978, at some time prior to 2 a.m., he and Milton Walker ("Greek") knocked on 67-year-old Cutis Lovelace's apartment door in the same building, room 37. Lovelace shared his apartment with a woman friend, Louise Drake. Ms. Drake was not in the apartment at the time. Lovelace apparently

recognized Sanders and Walker and he invited the two men in. A few moments later, Sanders struck Lovelace on the head with a brick. Lovelace fell to the floor unconscious. The two assailants bound Lovelace's ankles and arms with a necktie, rummaged through his dresser drawers, searched his pockets and scavenged his apartment.

Lovelace's body was taken to Cook County Hospital, where he was pronounced dead. An autopsy revealed scalp lacerations, caused by a blunt instrument, as well as abrasions and contusions on his head and shoulders. None of the blunt trauma injuries were sufficient to cause Lovelace's death, however. Instead, Lovelace died by ligature strangulation. Robert J. Stein, Chief Medical Examiner of Cook County and an expert in the field of forensic pathology, testified that Lovelace's strangulation could have occurred 5 to 10 minutes after the blows were inflicted. A tie found on Lovelace could have been used to strangle him.

During their investigation of the murder scene, the police were given a pair of men's slacks by George Robinson, who resided at the Boulevard Hotel with his wife. Robinson said he had found the slacks behind the hotel. The police found a coat and a white cloth with blood on them below Lovelace's hotel room window. Photographs and blood samples were taken for evidence along with a brick with bloodstains on it and glass fragments. The only items that were processed for fingerprints were glass fragments, a glass bottle and a glass jar.

The next evening, Saturday, October 14, 1978, police responded to a radio call to investigate a fight at 2145 Lake Street, apartment 702. There they spoke with Beverly Sanders, defendant's wife. (Defendant visited and spent the night with Beverly about three times a week.) Beverly gave them a pillowcase containing men's clothing, a wedding band and a watch. She told the police that she had gotten the items from her husband, Robert Sanders, and that Robert had told her about robbing Curtis Lovelace. She went with the officers to look for her husband, whom they found and arrested one block from the Boulevard Hotel.

At the preliminary hearing, defendant objected to Beverly Sanders' testimony as to what he had told her about his involvement in the murder. Defendant argued that the presence of family members, in this case, three of the four children of Robert and Beverly Sanders, did not destroy the confidential nature of a marital communication between husband and wife. In rebuttal, the State argued that defendant sought to enlarge a "narrow privilege to include a family privilege" and that there was no family privilege when a husband and wife are not alone or when they know that other people will hear

their conversation. The court sustained defendant's objection and found no probable cause. Later that day, defendant appeared before a grand jury, which refused to return an indictment against him.

Milton Walker ("Greek") was arrested on October 25, 1978, 12 days after the murder. A police officer testified before a grand jury that Walker's arrest report had charged him with murder but that the report had later been altered in writing by someone to change the offense to armed robbery. The police found Walker asleep in a Volkswagen van behind a drugstore on a vacant lot. Walker testified at trial that he had been drinking since 7 a.m. that morning and had consumed 15 pints of wine by the time he was arrested—at approximately 11 p.m. Walker also testified that he had been addicted to narcotics for 30 years. After his arrest, he was held in custody in a police station lockup cell.

The following morning, Walker appeared before a grand jury. He later testified at a pretrial hearing that a State's Attorney spoke to him after his arrest and told him that if he (Walker) appeared before the grand jury, "it would go easier" with him. Walker said that the State's Attorney treated him like a child by telling him exactly what to say when asked a question before the grand jury. Walker also said he was made to feel that he would not be charged with a crime if he testified. Walker confessed to having been involved in the murder and the grand jury returned an indictment against him for armed robbery, aggravated battery and armed violence. An indictment was also returned charging Sanders with murder and armed robbery.

During pretrial discovery, defendant filed a motion in limine in a second attempt to prevent Beverly Sanders from testifying as to any conversations she had with her husband. The motion, based on the husband-wife privilege (Ill. Rev. Stat. 1981, ch. 38, par. 155—1), was not ruled on.

Two weeks later, the prosecution informed defendant's attorneys that based on their alleged bribing of witnesses, they were under investigation and that charges may be filed against them for obstruction of justice. Because of this investigation and the possibility that defendant's attorneys would have to refute the allegations made against them under oath during trial, they withdrew from the case. A bar association attorney was substituted, who participated in the jury selection and thereafter represented defendant.

Defendant's trial began September 25, 1980. The State called Roy Gibson, a handyman at the Boulevard Hotel, as its first witness. Gibson explained that at approximately 4 a.m. on October 14, 1978, he saw Louise Drake enter the lobby of the hotel and go to her (Lov-

elace's) room. Ms. Drake immediately returned to the lobby and told Gibson that she believed Curtis Lovelace was dead. Gibson went up to the room, noticed that the door was ajar and walked in. Lovelace was lying face down and had on nothing but undershorts. His feet were tied together with a necktie. The police were then notified. Gibson further testified that he noticed a trail of blood on the carpeting that led from Lovelace's apartment to the washroom, about 40 feet away. In the washroom, blood was on the bathtub and on the window sill. The bathroom window was open. Gibson said he asked the police to shine a flashlight on the ground, directly below the bathroom window. There he saw a bloody trench coat. The police took the coat as evidence.

On cross-examination, Gibson testified that he was in the hotel lobby from 9 p.m. on October 13 until 4 a.m. October 14 and that he did not see defendant enter the hotel during that period. He said that the hotel had only one front entrance and that everyone, including the hotel residents, had to be buzzed in by the front desk. The hotel residents' keys would not unlock the front door. Gibson testified further that there were bricks in the yard outside the hotel.

On redirect examination Gibson testified that when Ms. Drake came from her room upstairs she was excited and in a hurry.

Next to testify for the prosecution was Dora Husband, desk clerk at the Boulevard Hotel. Dora testified that on Friday, October 13, she saw Robert Sanders come into the lobby and make a telephone call. He was with a boy about 9 or 10 years old who he said was his son. Dora testified further that on Saturday, October 14 between 8:30 and 9 a.m., George Robinson came into the hotel office carrying a pair of pants he had gotten from the alley. Dora recognized the pants as those belonging to Curtis Lovelace.

On cross-examination, Dora stated that she did not see Curtis Lovelace on Friday, October 13. She recognized a sweater she was shown by defendant as one that Curtis Lovelace had worn.

On redirect examination, Dora testified that Robert Sanders was registered in room 39 and Curtis Lovelace in room 37.

The prosecution next called George Robinson and then Isaac Orr, who was a part-time desk clerk at the Boulevard Hotel. They were questioned extensively by the prosecution and by defendant.

After George Robinson identified Robert Sanders in the courtroom, he testified that on the night of the murder he observed Sanders throwing clothes over a fence behind the hotel. The next morning he retrieved a pair of pants that he found and gave them to Dora Husband, the desk clerk. He testified further that he had seen

Curtis Lovelace wearing the same pants.

On cross-examination, Robinson testified that he had a drinking problem and had been hospitalized four or five times in 1978. He testified that his eyes "were bad" and that he should wear glasses, but didn't because he disliked them. Robinson testified further that at 9 a.m. on October 13, 1978, he and Curtis Lovelace went to a currency exchange to cash Curtis' government check. They took a walk for the rest of the morning. At 4:30 p.m. they began drinking. Robinson testified that later that evening in the hotel lobby he heard people talking about robbing Curtis.

The prosecution's remaining witnesses were police officers, the evidence technician who photographed and fingerprinted Lovelace's room, the Cook County medical examiner, Louise Drake and Beverly Sanders, whose testimony comprised over 120 pages of record transcript.

On direct examination, Beverly Sanders testified that between October 13 and 14, 1978, she had three conversations with her husband. She said that during the first conversation, her husband told her, in the presence of one or more of their children, that he was going to rob Curtis Lovelace. Beverly testified further that the second conversation occurred on October 14 at approximately 3 a.m. when Robert returned home. Beverly had gone to bed. Robert awakened her and placed a watch on her left arm and a ring on her right finger. She testified that she had never seen those items before. She and Robert were the only ones in the bedroom at this time. The third conversation took place later that morning, between 11:30 a.m. and 12 noon. Beverly testified that in the presence of their three sons, Robert told her that he had robbed Curtis Lovelace by hitting him with a brick and that "Greek" put a tie around Lovelace's neck. The State then showed Beverly a sweater and two pairs of pants. Beverly identified them as items that Robert told her he had stolen from Lovelace. Beverly further testified that Robert said he had bragged about robbing Lovelace, that he had told other people that he and "Greek" had just killed somebody and that Robert didn't appear nervous until he found out that Curtis Lovelace had died.

On cross-examination, Beverly testified that the State had put her and her children in a Holiday Inn for about 10 days and that they gave her $10 a day for cab fare and meals. Defendant read into evidence the bill for this expenditure, which totalled $1,916.41.

Beverly testified on redirect examination that defendant's attorneys (public defenders) who first handled his case, told her to avoid testifying in court, to pretend that she was an alcoholic and had am-

nesia, to hide from the State's Attorney and that if she was convicted for perjury they (the public defenders) would get her out and would get her a job.

The defense called Michael Morrissey to testify. Morrissey had been one of the attorneys who initially handled Sanders' case but who resigned when the prosecution began its grand jury investigation. Morrissey invoked the fifth amendment testimonial privilege and thereafter refused to answer questions. A law clerk and a second public defender who both had been involved with Sanders' case also refused to testify.

The court then permitted defendant to reopen his cross-examination of Beverly Sanders, who testified that on November 17, 1978, approximately one month after Lovelace was murdered, two men entered her apartment and injected a hypodermic needle filled with "T's and Blue's" (Talwin and Parabenzamine) in her back. The men told her they were instructed by Curtis Brown, Beverly's boyfriend at the time, to inject her with drugs so that she would not be able to appear in court. Beverly further stated that she had to be hospitalized for four days.

Further testifying, Beverly said that four months later, on March 26, 1979, Curtis Brown himself injected her with "T's and Blue's" because he didn't want her to be involved in her husband's trial. Beverly was again hospitalized.

Last to testify was Mary Ann Mohan, an attorney for the U.S. Department of Justice in Washington, D.C., who, at the time of the murder, was a microanalyst in the crime laboratory of the Chicago Police Department. On direct and cross-examination, Ms. Mohan testified that she had analyzed blood, hair samples and other items that were obtained as evidence from Curtis Lovelace's clothes and body. She further stated that Curtis Lovelace had blood type B and that type B blood was found on the brick which defendant used to strike Lovelace as well as on the front of defendant's pants.

After both sides rested and gave their closing arguments, the jury found Robert Sanders guilty of robbery and murder. Sanders was sentenced to concurrent terms of 30 years for armed robbery and 50 years for murder. Defendant appealed.

OPINION

Defendant specifies certain errors that he contends denied him a fair trial. We will address the first assignment of error in length, since it is dispositive of the others.

Defendant first contends that the trial court's admission of Be-

verly Sanders' testimony violated the husband-wife testimonial privilege (Ill. Rev. Stat. 1981, ch. 38, par. 155—1). To exclude his wife's testimony, defendant filed a motion *in limine* prior to trial, however, the court never ruled on the motion and defendant did not object to the conversations. The general rule here, as the prosecution argues, is that on appeal, an issue is considered waived when a defendant failed to either make a timely objection at trial (*People v. Ferguson* (1981), 102 Ill. App. 3d 702, 429 N.E.2d 1321) or to raise the issue in a post-trial motion (*People v. Foster* (1979), 76 Ill. 2d 365, 392 N.E.2d 6). Defendant argues in rebuttal, however, that in spite of his failure to object to Beverly Sanders' testimony and in spite of his failure to renew his motion *in limine* to exclude her statements, the trial court committed plain error by allowing her to testify. We agree. As far as the first and second conversations are concerned, their admission was, in fact, reversible error.

The principle cases cited by defendant regarding the applicability of the plain error doctrine to the case at bar are on point. One such case is *People v. Carlson* (1980), 79 Ill. 2d 564, 404 N.E.2d 233.

The Illinois Supreme Court held in *Carlson* that although the failure to object to the admission of evidence at trial generally operates as a waiver of the right to consider the question on appeal, this rule is not absolute. The court stated:

> "Our Rule 615(a) embodies the exception to the waiver rule. It provides, in part:
>
> 'Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court.' 73 Ill. 2d R. 615(a)." *People v. Carlson* (1980), 79 Ill. 2d 564, 576.

A court of review will grant relief, therefore, if an error is so prejudicial and of such magnitude that the commission thereof denies the accused a fair and impartial trial. *People v. Carlson* (1980), 79 Ill. 2d 564, 577.

Applying the above to the present case, we find that because Beverly Sanders' testimony regarding the first and second conversations clearly violated the marital communication privilege, the trial court committed error by admitting them into evidence. Mrs. Sanders' testimony was prejudicial and it could have contributed to the jury's guilty verdict. Its admission therefore denied defendant a fair trial.

*People v. Velillari* (1980), 84 Ill. App. 3d 333, 405 N.E.2d 466, the second case cited by defendant, affirms the general rule that a reviewing court is authorized to relax the general waiver rule as a matter of grace to consider plain errors affecting substantial rights. This

case, like *Carlson*, reiterates a rule of procedure which finds its justification upon the interest of a fair, orderly and expeditious administration of justice. See *People v. Harrawood* (1978), 66 Ill. App. 3d 163, 383 N.E.2d 707.

Reversible error was also found in *People v. Morris* (1980), 81 Ill. App. 3d 288, 401 N.E.2d 284, defendant's third case. The trial court held in *Morris* that in spite of the defendant's failure to object at trial or in a post-trial motion to the court's failure to give additional jury instructions, the interests of justice required that the issue be considered. Like *Carlson* and *Velillari, Morris* restates the proposition that a reviewing court may use its discretion and apply the plain error doctrine as embodied in Supreme Court Rule 615 (73 Ill. 2d R. 615) when errors affecting substantial rights are noticed although they were not brought to the attention of the trial court.

In the case at bar, a trial error resulted in substantial prejudice to defendant. The prejudicial trial error was Beverly Sanders' testimony concerning her first two conversations with her husband which was vital evidence in the prosecution's case. The court's admission of the testimony was in contradiction to Illinois law, which states that in criminal cases neither spouse may testify concerning any communication or admission made by either of them to the other, or as to any conversation between them during marriage, subject to certain exceptions not relevant to this case. (Ill. Rev. Stat. 1981, ch. 38, par. 155—1; *People v. Dubanowski* (1979), 75 Ill. App. 3d 809, 394 N.E.2d 605.) Moreover, a statement made in private by one spouse to the other is presumed to be confidential, and is therefore privileged, unless the contrary is evident. (*People v. Burton* (1972), 6 Ill. App. 3d 879, 286 N.E.2d 792, *cert. denied* (1973), 411 U.S. 937, 36 L. Ed. 2d 399, 93 S. Ct. 1917; *People v. Palumbo* (1955), 5 Ill. 2d 409, 125 N.E.2d 518.) Admission of Mrs. Sanders' testimony violated State law and contributed to the jury's guilty verdict as well. It is therefore the type of substantial, prejudicial error which Supreme Court Rule 615 is meant to correct.

To clarify our reasoning, we will set forth the pertinent portions of Beverly Sanders' damaging testimony.

I

Beverly testified that between Friday, October 13, 1978, and Saturday, October 14, 1978, she and Robert Sanders had three separate conversations regarding the robbery and murder.

The first conversation took place Friday evening, October 13, 1978. On direct examination by the State, Beverly testified that Ro-

bert told her, in the presence of their children, that he was going to rob Curtis Lovelace. Beverly's testimony as to the first conversation was as follows:

> "Q: Before he [defendant] left did you have a conversation with him *in the presence* of any one of your children?
> A: Yes.
> Q: Did he tell you what he was going to do that evening?
> A: Yes, he did.
> Q: Tell the jury, please, what your husband, Robert Sanders, told you he was going to do.
> A: He said he was going to rob Curtis."

(Emphasis added.)

Defendant asserts that this was a confidential marital communication because Beverly did not *specify* which child was in the apartment at that time nor did she say whether any one of the children actually heard the conversation. Defendant further contends this testimony is unclear because Beverly used the same word, "present," to mean that during her second conversation with Robert in their bedroom, the children *were somewhere in the apartment*. The pertinent testimony as to Beverly's use of the word "present" regarding the second conversation follows:

> "Q: Did you have occasion to go to bed that evening, Friday, October 13, yourself?
> A: Yes.
> Q: At the time that you went to bed on that evening, *who was present* in your apartment?
> A: Myself and my children.
>
> * * *
>
> Q: Could you tell the jury, please, what rooms were occupied by these persons that you named, including yourself, when you went to bed that night?
> A: I was in the bedroom and the boys were in one room. Nobody was in the other room.
> Q: Was your daughter present that evening?
> A: No.
> Q: Was there anyone occupying her bedroom?
> A: When I went to bed?
> Q: Yes, Ma'am.
> A: No.
> Q: Now, did you have occasion to become awakened sometime during the night after you went to bed?
> A: Yes.

Q: Could you tell the jury do you know about what time it was that you went to sleep on that evening?

A: No, I don't know what time it was exactly.

Q: Do you know whether it was before or after midnight?

A: I think it was after, I don't know.

Q: Now, you said that you had occasion to become awakened, is that correct?

A: Yes.

Q: As you were sleeping in you bed, is that right?

A: Yes, I was.

Q: Could you tell the jury, please, what happened when you were awakened?

A: My husband was in the bed with me, messing with me.

Q: What did he do?

A: He was trying to, you know, messing with me, and then he gave me something.

Q: Tell the jury, please, what he gave you at that time?

A: A watch and a ring.

Q: Would you tell the jury what he did with the watch and what he did with the ring?

A: Put them on my arm and on my ringer, on my right finger.

Q: Did he have anything else with him at that time?

A: He say he had some lady's clothing for me and something else, and I told him to go on out of my room.

Q: Did he leave your room?

A: Yes.

Q: At that time did you see where he went?

A: No, I didn't.

Q: Now, did you have occasion to wake up in the morning?

A: Yes, I did.

Q: Tell the jury approximately what time it was that you woke up?

A: It was after seven in the morning.

Q: At that time were you wearing anything that you weren't wearing when you went to sleep?

A: The ring and the watch."

(Emphasis added.)

■ Upon analyzing Beverly's testimony, we find that her use of the words "presence" in one instance (that is, her reply to the word "present" as used by the prosecution) and "present" in another, are ambiguous. First, Beverly was asked whether Robert talked to her in the presence of the children. She answered yes, though she didn't ex-

plain exactly where the children were—either in the same room or somewhere in the apartment. After further testimony and additional questions, Beverly used the same word, "present," to mean that during her second conversation with defendant the children were in the apartment when she went to bed. We conclude, therefore, that Beverly's generic usage of the word "present" is unclear. The first marital communication may well have transpired out of the hearing range of the children. They may have been at home, but that does not necessarily mean that they heard what their parents said. Since no conclusive showing to the contrary was made, Beverly's testimony concerning the first conversation was erroneously admitted into evidence. It was a privileged, confidential communication between husband and wife and therefore protected by statute. Ill. Rev. Stat. 1981, ch. 38, par. 155—1.

## II

The second conversation between Beverly and Robert Sanders occurred in the early morning hours of October 14. There is no evidence in the record to suggest that any of the children were present (in the same room) at this time. According to Beverly's testimony, she was alone in her bedroom. Her three sons were in a second bedroom. Her daughter was not at home. Robert entered Beverly's bedroom, climbed into bed with her and gave her a watch and ring. Beverly testified that Robert then told her that he had some lady's clothing as well as other items for her. She thereafter told Robert to leave, and he did. He slept in another room. When Beverly awoke, she was still wearing the ring and watch.

As with the first conversation, the State had the burden of rebutting the presumption of confidentiality of this marital communication (that is, the presumption of confidentiality of the conversation between defendant and his wife). In *State v. Smith* (Me. 1978), 384 A.2d 687, the court stated:

> "*** [O]nce the defendant established that he had 'communicated' with his wife, the burden was then upon the State to show that either because of the nature of the communication or the circumstances under which it was made the communication was not intended to be, or should not be considered, confidential." 384 A.2d 687, 691.

The State argues that Robert Sanders gave the watch and ring to his wife "knowing" that she would eventually wear and display them in public and that he therefore did not intend for this act to be confidential. We disagree.

Although an act, unlike a statement, cannot be presumed to be confidential (*People v. Burton* (1972), 6 Ill. App. 3d 879, 286 N.E.2d 792, *cert. denied* (1973), 411 U.S. 937, 36 L. Ed. 2d 399, 93 S. Ct. 1917), the facts surrounding this predawn exchange between Beverly and Robert in their bedroom lead us to conclude that Robert's act of giving Beverly a watch and a ring, as well as his conversation with her, was, without a doubt, intended to be a confidential communication. The communication was made in a private bedroom, between husband and wife and there was no evidence introduced at trial to suggest that the children heard or saw what transpired. Clearly, under these circumstances, Robert Sanders had a reasonable expectation of confidentiality. The standard for claiming the privilege as expressed by the highest court of Maine is that where there has not been an express invocation of confidentiality, the party claiming the privilege must have acted in *reliance upon an expectancy*, reasonable under all the circumstances, that the conduct itself, or other consequences which it might convey, will be transmitted only to the spouse and to no other person (such that a confidentiality confined to husband and wife can be a reasonable possibility under the circumstances). *State v. Benner* (Me. 1971), 284 A.2d 91.

■ We agree with defendant, therefore, that the State failed to prove that Robert Sanders' words and acts were not intended to be privileged. Because of the confidential nature of this and the first marital communication, it was plain error for the trial court to permit Beverly Sanders to testify as to their details.

### III

Having now established that the first two conversations between defendant and his wife were privileged communications, we address the next issue, whether the presence of at least one of the Sanders' children during the third conversation destroyed its confidential character. For the following reasons, we find that confidentiality was in fact destroyed.

The presence of third parties generally shows that a marital communication was *not* intended to be confidential. (U.S. *ex rel. Torres v. Brierton* (N.D. Ill. 1978), 460 F. Supp. 704.) However, the presence of children during a marital communication presents unique problems, because of their age, level of comprehension and what they are doing when the communication takes place naturally vary with each case. This issue has been addressed by our legal system at least as early as 1891, as we will show, because of the variables just mentioned, a child's presence may or may not destroy the confidential nature of a

communication between husband and wife.

In *Lyon v. Prouty* (1891), 154 Mass. 488, 28 N.E. 908, a conversation occurred between the husband and wife in the presence of their 14-year-old daughter. In reaching its decision that the conversation was *not* confidential, the court considered the place where the marital communication occurred, its subject matter, the age of the child, coupled with the fact that the child could have been a competent witness to testify as to what she heard. 154 Mass. 488, 490-91, 28 N.E. 908, 909.

The supreme court of New York in 1891 also held that a marital communication which occurred in the presence of a child (whose age was not cited in the opinion) was *not* confidential. (*People v. Lewis* (1891), 16 N.Y.S. 881, *aff'd* (1892), 136 N.Y. 633, 32 N.E. 1014.) Placing emphasis on the topic of the communication, the court stated that it was not confidential since it was a discussion about stocks and money. 16 N.Y.S. 881, 884.

In *Freeman v. Freeman* (1921), 238 Mass. 150, 130 N.E. 220, the Massachusetts supreme court held that the trial judge should first determine whether a child who hears a martial communication is of sufficient intelligence to pay attention and to understand what is being said. The court held that the marital communication in that case was *not* confidential because it took place in the presence of the couple's children, the eldest of whom was nine years old. (238 Mass. 150, 161, 130 N.E. 220, 222.) In *Linnell v. Linnell* (1924), 249 Mass. 51, 54, 143 N.E. 813, 814, the supreme court of Massachusetts again held that a communication was *not* confidential and was therefore admissible simply because the 10-year-old daughter overheard her parents' conversation in the next room.

West Virginia and Maryland have held that the presence of children who are old enough to understand what is being said destroys the confidential nature of a marital communication. (*Fuller v. Fuller* (1925), 100 W. Va. 309, 130 S.E. 270; *Master v. Master* (1960), 223 Md. 618, 166 A.2d 251.) We also note that the supreme court of Wisconsin decided a novel case wherein the defendant told his wife in the presence of two boys (ages 15 and 14) who were not defendant's children that he and the youths had just committed two burglaries. The court held that this communication was not confidential. (*Abraham v. State* (1970), 47 Wisc. 2d 44, 176 N.W.2d 349.) More recently, the issue of the presence of children during a martial communication has been decided by the appellate courts of Washington and Tennessee and by the supreme court of Indiana. *State v. Wilder* (1974), 12 Wash. App. 296, 529 P.2d 1109; *Martin v. State* (Tenn. Crim. App. 1979),

584 S.W.2d 830; *Robinson v. State* (1981), ___ Ind. ___, 424 N.E.2d 119.

Although in all of these cases the presence of children destroyed the confidential character of a marital communication, we note that a minority of jurisdictions have decided differently.

The supreme court of Massachusetts held in *Jacobs v. Hesler* (1873), 113 Mass. 157, that a conversation between a husband and wife was a confidential communication because their young children (ages not given) neither participated in nor paid any attention to what was being said. Forty-eight years later, in *Freeman v. Freeman* (1921), 238 Mass. 150, 130 N.E. 220, and *Linnell v. Linnell* (1924), 249 Mass. 51, 143 N.E. 813, cited above, the court held that the presence of children destroyed confidentiality. We factually distinguish *Jacobs* from the later Massachusetts cases. In *Jacobs*, the court determined that because the children were so young, they were incapable of understanding what was said. Confidentiality was therefore not disturbed. In *Freeman* and *Linnell*, the children were 10 and nine years old, respectively. Apparently, because of their age, the court believed that in each case they were old enough to understand what was being said and confidentiality was destroyed. The court's reasoning in Jacobs on one hand, and *Freeman* and *Linnell* on the other, does indeed support our holding in the case at bar in that a child's age and what he was doing at the time are relevant and must be taken into consideration by the trier of fact. In *Hopkins v. Grimshaw* (1897), 165 U.S. 342, 351, 41 L. Ed. 739, 742, 17 S. Ct. 401, 404, a "young daughter " (no age given) was present but since she did not appear to have taken any part in her parents' conversation, its confidentiality was not destroyed. *Amer Realty Co. v. Spack* (1932), 280 Mass. 96, 181 N.E. 753 (no ages of children given), and *Hicks v. Hicks* (1967), 271 N.C. 204, 155 S.E.2d 799 (eight-year-old child), also held that the presence of children did not destroy confidentiality. The court in *Amer Realty* upheld a lower decision to exclude the marital conversation because the record did not disclose whether the children's ages had been proven. (280 Mass. 96, 100, 181 N.E. 753, 754.) Presumably, had it been shown that the children were of an age to understand and to testify as to the nature of the conversation, its confidentiality would have been destroyed. The supreme court of North Carolina in *Hicks* held that the presence of an eight-year-old daughter did *not* destroy the "veil of confidence" of the marital communication because she was singing or playing in the area where the communication occurred. 271 N.C. 204, 207, 155 S.E.2d 799, 802.

It is clear that in these four cases, *Jacobs, Hopkins, Amer Realty*

and *Hicks*, confidentiality was *not* destroyed by the presence of children because they either did not participate in, pay any attention to or were too young to understand what was being said.

Applying these principles to the third communication between Beverly and Robert Sanders, we conclude that the presence of at least one child, Robert Vaughn, destroyed its confidentiality. The conversation occurred between 11:30 a.m. and 12 noon on Saturday, October 14, 1978. Beverly's testimony regarding the conversation was as follows:

> "Q: Now, at that time, Beverly, did you have occasion to have a conversation with your husband in the presence of your son, Robert Vaughn?
>
> A: Yes, I did.
>
> Q: Now, could you tell the ladies and gentlemen of the jury who was present during this conversation between your husband and yourself?
>
> A: My son, Robert, my son, Albert, and my son, William.
>
> Q: Is your son, Robert, a son that was born out of your marriage with the defendant, Robert Sanders?
>
> A: Is he his child?
>
> Q: Yes.
>
> A: He is not.
>
> Q: Is that from a previous marriage?
>
> A: I wasn't married.
>
> Q: Now, would you tell the jury, please, what, if anything, was said between yourselves at that time?
>
> A: My husband told me that he had robbed Curtis.
>
> Q: Did he tell you who robbed Curtis?
>
> A: He told me him and Greek went to the mans' house. He told me he told Greek to throw a coat over the man's head and hit him in the head with a brick and he said the man fell and they took the things and the clothes out the window to him."

Although Beverly did not state and the record does not disclose what the children were doing at the time they heard the conversation, each child was old enough to understand and to possibly testify as to what he heard. Because of the children's ages (Robert, 13; Albert, 10; William, 8), their presence negated confidentiality which, as a rule, underlies a marital communication. See *U.S. ex rel. Torres v. Brierton* (N.D. Ill. 1978), 460 F. Supp. 704.

On the basis of the foregoing case law analysis, we feel compelled to conclude that the third marital conversation between Robert and

Beverly Sanders was rightfully admitted into evidence by the trial court. We therefore join other State courts in holding that statements between spouses are presumed to be confidential, but this presumption can be rebutted by the presence of children who are old enough to understand what is being said and who could possibly testify as to what they heard, or, who participated in the marital communication itself. A child can in fact be considered a third party who, like an adult, breaks the marital privilege, but the child's age, what he was doing when the communication was made, and his level of comprehension must be considered. A very young child of tender age, for example, clearly would not destroy the confidential nature of a marital communication. 81 Am. Jur. 2d *Witnesses* sec. 155 (1964).

Although our ruling today is in accord with the weight of authority, the issue is of first impression in Illinois. It will necessitate a case-by-case analysis by the trier of fact to ascertain whether the child or children were attentive to the marital communication in question, what their comprehension level is in light of their age, their capacity to testify as to what they heard, the intent of the spouses, where the conversation was held, as well as any additional relevant evidence to prove that the marital privilege was or was not destroyed.

Defendant takes an opposite view regarding the third conversation and contends that there is conflicting evidence as to the presence of the Sanders' children. Defendant argues that the children's presence in the apartment does not necessarily mean they were privy to their parents' conversation. Defendant relies on a written statement by 13-year-old Robert Vaughn, in which he says that although he was at home, he and his friends were in another room upstairs. He told his friends to leave when he heard his parents arguing. Robert Vaughn specifically denied hearing what his parents said. In his written statement, he admitted that his mother told him what happened, that he "went along with her story" and that he told the police "what my mother said to be about it."

We cannot accept defendant's argument. First, Robert Vaughn's statement was never authenticated or admitted into evidence. It was merely filed with the circuit court clerk and thereby became an addition to the trial record. Second, although defendant interviewed Robert Vaughn before trial, he was never called to testify. The veracity of Robert's earlier written statement concerning defendant was therefore never challenged nor was the extent of his knowledge of his parents' conversation ever questioned even though defendant informed the court during a trial recess that he was prepared to show that the police pressured and harrassed Robert Vaughn to make an earlier in-

criminating statement. Defendant never produced any persuasive evidence, however. And, most importantly, Beverly Sanders' testimony on direct examination that her three sons were present when Robert told her of the robbery was never rebutted. In fact, Beverly reiterated on cross-examination that her son, Robert Vaughn, was present during the third conversation with her husband. The presence of the other two sons was not addressed. Simply stated, defendant did not produce rebuttal witnesses or evidence of any kind on this point. In essence, Beverly's testimony remained unimpeached.

■ We observe further that Beverly's use of the word "presence" in this instance and her use of these words as previously set forth in her prior testimony regarding the first and second communications are clearly distinguishable. During its examination of Beverly about the third communication, the prosecution queried with specificity: "*** did you have occasion to have a conversation with your husband in the presence of your son, Robert Vaughn?" which question was immediately reinforced with a second question, "*** who was present during this conversation between your husband and yourself?" Because of the exactness of the prosecution's questions, coupled with the fact that Beverly's testimony was not shaken on cross-examination, we again reach the conclusion that the third conversation was *not* privileged and the trial court properly admitted it into evidence.

Because of our disposition of the issue of admitting Beverly Sanders' testimony of the first and second conversations, it will not be necessary to address the other matters raised on appeal. Accordingly, the judgments of conviction on the charges of murder and armed robbery are reversed and the cause is remanded for a new trial.

Reversed and remanded.

LORENZ and MEJDA, JJ., concur.