THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CRAIG MUZARD, Defendant-Appellant.

First District (2nd Division)   No. 1—88—1234

Opinion filed February 5, 1991.—Rehearing denied March 27, 1991.

Genson, Steinback & Gillespie, of Chicago (Edward M. Genson and Geena D. Cohen, of counsel), for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Renee Goldfarb, Paul Gliatta and John deGrasse, Assistant State's Attorneys, of counsel), for the People.

JUSTICE DiVITO delivered the opinion of the court:

A jury found defendant Craig Muzard guilty of murder (Ill. Rev. Stat. 1985, ch. 38, pars. 9—1(a)(1),(a)(2)), and he was sentenced to 20 years in the Illinois Department of Corrections. On appeal, defendant contends that his conviction must be reversed because (1) the State violated the trial court's *in limine* order, engaged in conduct designed to prejudice defendant and his counsel, and misled the jury in closing arguments; (2) conversations protected by marital privilege were improperly admitted into evidence against him; and (3) the State failed to prove that he was guilty of murder beyond a reasonable doubt.

Evidence at trial established that in February 1986, defendant and his wife, Sandra Muzard, had been married 10 years and were the parents of two daughters, ages eight and four. Defendant was employed as an engineer for WLS radio.

In December 1985, Brian Tosch was a carpenter who was hired by defendant to panel the hot tub room which had been recently added to the Muzard residence. Since Tosch resided in Wisconsin, defendant invited him to live in the Muzard home until he completed the job. During the 10 to 12 days of his stay, or shortly thereafter, Tosch and Sandra began an intimate sexual relationship. Suspecting that relationship, defendant ordered Tosch to leave his house just before the panelling work was completed.

On February 19, 1986, Sandra received two phone calls from Tosch. On three prior occasions before that date, she had met Tosch to have sexual relations with him. Unbeknownst to Sandra and Tosch, defendant had placed a device which was capable of starting a tape recorder and recording both sides of a conversation whenever a telephone was picked up anywhere in the house. During their phone conversations, Tosch and Sandra talked about some of their prior sexual activity and Tosch encouraged Sandra to meet him that night at a motel. When Sandra expressed reluctance to do so, Tosch said that if she did not meet him, he would begin shooting at cars on Interstate 90 and, if they were lucky, defendant would be in one of the cars and they could take his insurance money and the children and move into his house in Wisconsin.

Defendant listened to the tape recording of these conversations after Sandra had gone out on the evening of February 19. He immediately woke up his two daughters and drove with them to the motel identified on the tape. In the parking lot he saw his wife's car. He learned the room in which Tosch was registered from the desk clerk, and went to the room with both of his daughters. When he was admitted by Tosch, Sandra, who had been alerted by the clerk, was not there. When he went to the window, he saw that Sandra's car was no longer in the parking lot. Defendant took his daughters to the home of Joseph Hecker, left them there, and returned to the motel with Hecker. They knocked on Tosch's door, but he was gone. Tosch had gone to meet Sandra at another motel, where they stayed the night together.

On the morning of the next day, February 20, 1986, before Sandra returned home, defendant talked to Christopher Bates, a neighbor. According to Bates, defendant said that his wife was having an affair with another man. Defendant asked Bates if he would kill the man or knew of someone who would do so. Defendant's version of that conversation was that Bates initiated the topic of having the man killed and that Bates knew someone who would do the job. Defendant denied pursuing the matter.

Later on February 20, according to defendant, he contacted Tosch and arranged a meeting at a restaurant to try to resolve matters. Defendant took a .22 caliber pistol with him. In the restaurant, according to defendant, Tosch put his keys and a knife on the table, told defendant that he had to let Sandra go, told him that Sandra enjoyed having sex with him more than with defendant, and told him of having sex with Sandra the night before and that very morning. After that meeting, defendant contacted Linda Brown, a WLS psy-

chologist who had been counselling him. She referred him to Dr. Irving Tracer, a psychiatrist, who telephonically prescribed sleeping pills and arranged an appointment for noon the next day.

On February 21, 1986, defendant saw Dr. Tracer, who recommended that defendant admit himself into Forest Psychiatric Hospital. Because the next day was his wedding anniversary, defendant said he decided to postpone his admission.

According to defendant, he received several telephone calls from Tosch requesting a meeting that day. Though defendant said he declined to meet with Tosch, he called Roy Tosch, Tosch's father, and asked for Tosch. Defendant informed Roy Tosch that his son was having an affair with his wife and sought his help.

Defendant stated that Tosch later contacted him by phone and suggested that they meet in a forest preserve. Because he feared Tosch, defendant suggested that they meet in a public place. A 7-Eleven store about a half mile from defendant's home was selected. Defendant put a loaded .22 caliber handgun in his right coat pocket and a loaded 9 millimeter handgun in the seat behind him. He then drove in his Cherokee Jeep to the 7-Eleven, met Tosch, drove across the street with Tosch following so that Tosch could leave his car in a more public parking lot, and then began driving with Tosch in the passenger seat of his car. Defendant said that he purposely placed his jacket on the console of his vehicle so that Tosch would see the butt of the gun protruding.

According to defendant, Tosch informed defendant that he was in love with Sandra and defendant cried and pleaded with Tosch to leave his family alone. Defendant then informed Tosch that he had a tape recording of the phone conversations he had with Sandra. Tosch said that Sandra thought he was more of a man than defendant and taunted defendant with sexual experiences he had with her. Tosch told defendant that he would have to get used to his children calling Tosch "dad" because they were going to leave defendant.

Defendant then informed Tosch that he had spoken with his father and he threatened to play the tape for Tosch's father. According to defendant, Tosch responded by shouting expletives and by hitting defendant in the right shoulder. As the two men "started pushing back and forth," defendant drove off the road. Both reached for the .22 caliber gun at the same time. Defendant had his right hand on the gun and Tosch had his hand on top of defendant's. As they struggled, "[t]he gun fired." While defendant was watching the road and applying the brake, "it fired two more times." Defendant did not know if those shots hit Tosch, but he thought the gun was touching

Tosch. They continued to struggle. The gun then jammed; it would not fire anymore; and defendant released it. When Tosch grabbed for the gun, defendant reached behind him for the other gun. Tosch then lurched toward defendant; when Tosch was on top of him, defendant "fired a couple of shots down at him" while the gun was touching Tosch. Tosch then "backed up toward the door" and defendant continued firing. Tosch then slumped over the seat and the console. By this time, the car was stopped in the middle of the road. Defendant felt Tosch's body for a pulse, but found none.

Sometime after 10 p.m., defendant then went to the home of his half brother, Mike Richardson. He entered the house and called, but no one responded. In the house, he attempted to "unjam" the gun, and it fired. He then began to leave. His sister-in-law, Ellen Richardson, had been awakened by defendant's car in the driveway and heard the gunshot, but did not know at that time what it was. She left her bedroom and talked to defendant, who left shortly thereafter. After Ellen Richardson went back to bed, defendant returned. This time Ellen saw that his hands were covered with blood. Defendant told her that he had killed Tosch and gave her both guns. Defendant said that he killed Tosch after Tosch had tried to shoot him with a gun that jammed. He stated that he had thrown Tosch's gun into a field. Defendant asked her to drive him to two places: to a field to look for the gun and to Tosch's car so that he could move it. She refused both requests. Ellen made numerous phone calls in an unsuccessful attempt to locate her husband. While awaiting her husband's return, she summoned Gordon Muzard, defendant's brother. Defendant rejected both Gordon's and Ellen's requests to call the police. Gordon left after a short period because he was so upset. As dawn approached, defendant put his car in the garage so that no one would see it.

At about 5:30 a.m., Mike Richardson came home. Defendant's requests for help in cleaning the car or burning it were rejected by Richardson. Defendant then took Tosch's body from the front of the car and placed it in the back. Later that morning, defendant drove to Dan Cordingley's house with Tosch's body in the back of his car. Ellen Richardson had called the police and told them of defendant's destination; he was arrested en route. Later, defendant made a statement to police, at first stating that Tosch had pulled his own gun and then admitting that he had lied and that Tosch had no gun. Police observed no marks or bruises on defendant.

Joseph Hecker, Scott Longueil and Dan Cordingley each testified that shortly after he was arrested, defendant requested that they

plant a gun in a field near the shooting. During his testimony, defendant admitted making these requests.

An autopsy revealed that Tosch was shot seven times. One bullet grazed off the top of the left side of his forehead. Two bullets entered the back of his neck and exited below the right ear; the gun causing these wounds was positioned behind his neck pointing towards the right. The point of entry of one of these bullets had characteristics of a "tight contact wound," indicating that the gun was pressed against the skin; the other point of entry had characteristics of a "loose contact wound," indicating that the gun was loosely on the skin or within close proximity to it. Another bullet entered his torso, exited his abdomen, and entered the palm of his right hand. Another bullet entered from his left side and went through his diaphragm. The sixth bullet entered beneath his left nipple, and the seventh bullet entered in the area of his upper right chest. The wounds caused by the last four bullets had characteristics indicating that the gun was held in close proximity to or touching his clothing. Four projectiles were recovered at the autopsy. The body had no bruises or "defensive wounds."

## I

Defendant maintains that error occurred because the State (a) knowingly and repeatedly defied the trial court's *in limine* order; (b) improperly attempted to unfairly prejudice the jury against him and defense counsel; and (c) made improper comments during opening statements and closing and rebuttal arguments.

## A

Defendant complains of three instances where the State allegedly violated the trial court's *in limine* order.

(1) During the questioning of Sandra, the State asked whether she had ever had sexual relations, about which defendant knew, with another man. Her affirmative response and the following question asking "on how many occasions" were objected to by defense counsel, who also moved for a mistrial based upon the State's alleged disregard of the *in limine* order. After a lengthy discussion in chambers, the trial court sustained the objection, instructed the jury to disregard the last inquiry, and denied the motion for mistrial.

(2) Defense witness Therese Krueger, wife of one of defendant's co-workers, had testified on direct examination that at a Christmas party for WLS employees in December 1985, Sandra had told her that she would rather have been home having sex with the carpenter.

On cross-examination, after Krueger said that she knew that Sandra and defendant were having marital problems, the State asked if she had been told by Sandra "about her husband's behavior with other women." Defendant's objection to this question was sustained, the jury was instructed to disregard the question, and defendant's motion for a mistrial was denied.

(3) During her testimony, Sandra had testified that, during the time that Tosch resided in their home, defendant had on one occasion taken off her brassiere in the presence of Tosch while the three of them were in the hot tub. During his testimony, defendant denied removing her brassiere and stated that Sandra had done so herself. On cross-examination the State asked what he had said in response to that action by Sandra. Defendant responded, "Nothing, we're fairly open-minded" and "we've been skinny dipping before in our own pool." The State then asked, "Have you ever done wife-swapping?" After defense counsel objected and after a lengthy discussion out of the presence of the jury, during which the State sought to produce evidence through a number of witnesses that wife-swapping had occurred, the trial court sustained defendant's objection, instructed the jury to disregard the question, and eventually denied defendant's motion for a mistrial, a motion which it initially took under advisement.

We have carefully examined the record to ascertain what, if any, *in limine* order the trial court entered in this case. We have found none. As a matter of fact, in examining the record before oral argument, we were unable to find even a written motion. The absence of both a motion and an order in the record was called to defense counsel's attention during oral argument. Counsel responded that the trial court's consideration of the motion and its order did not occur in the presence of a court reporter. Subsequent to oral argument, defense counsel was granted leave to file a supplemental record which contains the motion *in limine*. We note that the motion and its attached memorandum seek to preclude evidence of defendant's extramarital affairs and specifically argue for the admissibility of evidence concerning Sandra's extramarital affairs.

The record reflects that while the motion for mistrial concerning one of the alleged violations of the *in limine* order was being argued, the trial court itself stated that it was unsure of the substance of its prior ruling. We are thus asked to determine whether the State violated the trial court's *in limine* order without any certainty as to what that order was. Moreover, we are asked to determine that the trial court erred in its conclusion that the State's questions in this case warranted neither a mistrial nor a new trial. In short, we are

being asked to conclude that an *in limine* order was violated when the trial court itself did not rule that such an order was violated.

■ A party who asserts error bears the responsibility for preserving and presenting a sufficient record of that asserted error. (*People v. Smith* (1985), 106 Ill. 2d 327, 478 N.E.2d 357; *People v. Edwards* (1978), 74 Ill. 2d 1, 383 N.E.2d 944, *cert. denied* (1979), 442 U.S. 931, 61 L. Ed. 2d 299, 99 S. Ct. 2862.) Here, it was defendant's duty, as the party appealing the circuit court's judgment, to preserve and present on review an adequate record from which his allegation of error could be resolved. (*People v. Smith*, 106 Ill. 2d at 336.) As the supreme court said in *Edwards*, "Where the record is insufficient or does not demonstrate the alleged error, the reviewing court must refrain from supposition and decide accordingly." *People v. Edwards*, 74 Ill. 2d at 7.

Apart from the *in limine* issue, we conclude that the disputed questions were not so prejudicial as to warrant a reversal of defendant's conviction. In furtherance of one of the theories of defense in this case, defendant presented evidence that he was distraught over his discovery that his wife was having an affair with another man. The questions which he challenged at trial, and now argues constituted reversible error, certainly were relevant to his alleged state of mind. In support of his defense theory, defendant elicited evidence concerning Sandra's infidelity. Given the defense theory and the totality of evidence in this case, defendant's prior knowledge of Sandra's extramarital behavior was certainly relevant. Arguably, his own "behavior with other women" was also relevant, but we note that the objection to the question concerning that matter was quickly sustained, the jury was told to disregard it, and there was no further reference to the matter.

■ Given the inadequacy of the record regarding the trial court's *in limine* order, prompt action by the trial court in sustaining objections to the questions and in instructing the jury to disregard them, and our conclusion that the questions may indeed have had relevance, we reject defendant's contention that these questions constituted reversible error.

### B

Defendant next maintains that the State engaged in improper conduct designed to prejudice the jury against him and defense counsel. He cites as an example the State's angry objection to the testimony of Therese Krueger as irrelevant and improper. The record discloses that the jury was excused after this objection and the trial

court reprimanded both the State and defense counsel for their displays of anger in the presence of the jury. When the trial resumed, the trial court instructed the jury to consider only the evidence and not to be concerned by "any outbursts by either side."

Another example cited by defendant concerned the State's comment in open court that "everything is proper for the defense," after a defense objection was sustained. Though the record does not reflect the statement, the trial judge stated that he heard it and feared that the jury also heard it. Again, out of the presence of the jury, the trial court admonished all attorneys concerning "outbursts" and "comments" in the presence of the jury.

■ Neither of the above-described incidents indicate conduct designed to prejudice defendant or his counsel. On the contrary, though emotional outbursts are not condoned, both incidents typify reactions of advocates in a hotly contested trial.

Defendant also complains that the State elicited highly prejudicial statements from Sandra that she was "scared" and "afraid" of defendant. The record shows, however, that Sandra volunteered these statements in unresponsive answers to the State's questions. The record does not support the contention that the State purposefully elicited such information.

## C

■ We find no merit in defendant's claim that reversible error occurred because, in its opening statement, the State told the jury that defendant's claim of self-defense would be "laughable" and told the jury of Sandra's love for Tosch. Though a prosecutor's characterization, in opening statement, of an anticipated defense as laughable is inappropriate, that remark in no way prejudiced defendant. As for statements concerning Sandra's love for Tosch, the record shows that they were made in connection with her admitted infidelity. We fail to see how these remarks prejudiced defendant.

Defendant maintains that he was prejudiced by the State's closing-argument characterization of him as a liar, and by the State's attacking his credibility and that of his counsel because of his "two theories of defense."

■ In criminal cases involving questions of improper argument on the part of the State, each case must be decided on its own facts. (*People v. Weathers* (1975), 62 Ill. 2d 114, 338 N.E.2d 880.) Reversible error occurs where there are reasonable grounds for believing the jury was prejudiced by improper remarks. (*People v. Whitlow* (1982), 89 Ill. 2d 322, 341, 433 N.E.2d 629.) Unless they are based

on evidence, statements made in closing arguments by the State which suggest that defense counsel fabricated a defense theory, attempted to free his client through trickery or deception, or suborned perjury are improper. *People v. Emerson* (1983), 97 Ill. 2d 487, 497.

■ The record in this case, however, shows that the State was not suggesting that defense counsel was guilty of misrepresenting facts or presenting evidence designed to confuse the jury. On the contrary, there were adequate bases to challenge defendant's credibility. There were instances when his testimony contrasted sharply with that of other witnesses, such as when he disputed Bates' version of the conversation concerning killing the man involved with his wife. There was evidence which was inherently implausible, such as defendant's testimony that he intentionally left his coat in a place where Tosch could see the gun. There was evidence that, even after his arrest, defendant asked friends to plant a gun which might be linked to Tosch. Finally, there was explicit evidence that defendant lied in telling Ellen Richardson and the police that Tosch had his own gun and attempted to use it. Challenging the credibility of a defendant and his theory of defense is proper in closing argument when there is evidence which justifies that challenge. (*People v. Tiller* (1982), 94 Ill. 2d 303, 447 N.E.2d 174, *cert. denied* (1983), 461 U.S. 944, 77 L. Ed. 2d 1302, 103 S. Ct. 2121.) Ample justification was present here.

■ Finally, defendant maintains that error occurred because the State, during closing argument, argued an interpretation of the law which, in this case, would preclude a finding of "sudden" passion necessary to justify a voluntary manslaughter verdict. We note that, in response to defendant's objection, the trial court informed the jury that the law would be furnished to it only through the court's instructions. Furthermore, in considering the State's argument on this issue in proper context, we do not believe the State misstated the law (see, *e.g., People v. McCarthy* (1989), 132 Ill. 2d 331; *People v. Chevalier* (1989), 131 Ill. 2d 66, 544 N.E.2d 942), nor do we believe that the jury was misled.

## II

Defendant contends that Sandra was allowed to testify to three conversations which were protected by marital privilege. (Ill. Rev. Stat. 1985, ch. 38, par. 155—1.) He argues that the admission of these conversations was improper and contributed to the guilty verdict.

In Illinois, a husband and wife may testify for or against each other in criminal cases, provided that neither may testify as to any communication or admission made by either of them to the other or as to any conversation between them during marriage. (Ill. Rev. Stat. 1985, ch. 38, par. 155—1.) Admission of evidence in violation of the marital privilege, which contributes to a guilty verdict, constitutes denial of a fair trial and requires reversal. (*People v. Sanders* (1982), 111 Ill. App. 3d 1, 9, 443 N.E.2d 687.) However, where the record shows that the errors complained of could not reasonably have affected the result of the trial, the judgment of the trial court should be affirmed. *People v. Bartell* (1944), 386 Ill. 483, 491, 54 N.E.2d 700.

Sandra testified that at 5 p.m. on February 21, 1986, as she was about to leave the house, defendant said to her, "You're not going anywhere." "You're not going out because you're going to meet Gary." She responded, "Fine, I'll just be your puppet. I won't go anywhere."

Sandra testified that, in another conversation, defendant asked her, "Where's my ammunition?" and she responded, "I hid it." When defendant retorted, "I want it," she said, "No, I don't think you should have it." Defendant then said, "Give me my ammunition," and she said, "I'm not going to give it to you." Defendant then said, "You better give it to me. You're going to—something is going to happen."

Sandra also related the content of another conversation in which she stated that she asked defendant, "Why did you tell Gary that the three of us were going to meet when I never said that I would meet, that I didn't want to meet?" She also stated that she told defendant, "if he harmed one hair on Gary that would be it."

Our review of the record indicates that the marital privilege was waived as to a substantial portion of the first two conversations summarized above. (See *People v. Simpson* (1977), 68 Ill. 2d 276, 369 N.E.2d 1248.) As to the first conversation, Joseph Hecker testified that defendant called him on the evening of February 21 asking if he had seen Sandra. When Hecker said he had not, defendant said, "I told her to stay around the house. I told her to be home around 10:00 o'clock because I had a surprise for her, our problems would be over, and we would be a family again." As to the second conversation, defendant himself testified that he asked his wife for the ammunition. Furthermore, Hecker testified that defendant had. called him earlier on the evening of February 21 and asked if defendant could. bring over all his guns and ammunition. Hecker's recollection was

that defendant made that request because "he said he didn't trust himself with the guns in the house." Defendant, however, did not bring any items to Hecker's house that night.

Defendant contends that these conversations were offered to suggest defendant had a premeditated plan to murder Tosch and thus he could not have acted in self-defense or pursuant to sudden and intense passion at the time he shot Tosch. However, other evidence the jury heard, much of which we have already summarized, adequately indicated that defendant had a premeditated plan to kill Tosch. In this case, as the supreme court did in *Bartell*, we conclude that the admission of defendant's conversations with his wife could not reasonably have affected the result of the trial. *People v. Bartell*, 386 Ill. at 491.

## III

Defendant's final contention is that the State's evidence was insufficient to establish guilt of murder beyond a reasonable doubt. He asserts that the State failed to disprove self-defense beyond a reasonable doubt. (Ill. Rev. Stat. 1985, ch. 38, pars. 3—2(a), 7—1, 7—14.) Alternatively, he asserts that, at best, the evidence established only voluntary manslaughter. He premises this contention on his assertion that if self-defense was properly rejected by the jury, his unreasonable belief in the need for self-defense and/or his sudden and intense passion justified only a voluntary manslaughter verdict. We disagree.

When presented with a challenge to the sufficiency of the evidence, it is a reviewing court's function to carefully examine the evidence, giving due consideration to the fact that the trier of fact saw and heard the witnesses. (*People v. Young* (1989), 128 Ill. 2d 1, 48, 538 N.E.2d 461.) It is the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. (*People v. Young*, 128 Ill. 2d at 49.) The inquiry on review is not whether this court believes that the evidence at trial established guilt beyond a reasonable doubt but, " 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis omitted.) *People v. Young*, 128 Ill. 2d at 49, quoting *Jackson v. Virginia* (1979), 443 U.S. 307, 318-19, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2788-89.

A person who kills an individual without lawful justification is guilty of murder if he intends to kill or do great bodily harm to that individual, or knows that such acts will cause death to that

individual, or knows that the acts which cause the death create a strong probability of death or great bodily harm to that individual. (Ill. Rev. Stat. 1985, ch. 38, pars. 9—1(a)(1),(a)(2).) It is not necessary to show that a defendant had a specific intent to kill or do great bodily harm, or that he knew his acts would achieve those results. (*People v. Gross* (1988), 166 Ill. App. 3d 413, 420, 519 N.E.2d 1043.) Intent can be implied or inferred from the character of the act. (*People v. Szerletich* (1980), 86 Ill. App. 3d 1121, 1124, 408 N.E.2d 1098.) The question of intent is one to be resolved by the trier of fact, whose finding will not be reversed on appeal unless it is inherently impossible or unreasonable. *People v. Gross*, 166 Ill. App. 3d at 420.

The evidence in this case, much of which has already been summarized, showed that defendant knew of Sandra and Tosch's relationship; that defendant asked Joseph Hecker and Christopher Bates about the possibility of having Tosch killed; that defendant brought two loaded guns to his meeting with Tosch; that Tosch sustained seven gunshot wounds; that each of defendant's guns required a separate pull of the trigger for each firing; that neither defendant's nor Tosch's body revealed any bruises nor was there any other physical evidence that a struggle had occurred; that defendant lied to Ellen Richardson and the police about what initiated the shooting; that defendant made futile efforts to conceal what he had done; and that defendant asked friends to plant evidence.

■■■ Our standard of review, as recently reiterated by the supreme court, is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) (*People v. West* (1990), 137 Ill. 2d 558, 584, 560 N.E.2d 594.) The record establishes that the jury's verdict was justified by sufficient evidence, indeed overwhelming evidence, that defendant was guilty of murder beyond a reasonable doubt.

For the foregoing reasons, the judgment of the trial court is affirmed.

Affirmed.

SCARIANO, P.J., and BILANDIC,* J., concur.

---

*Justice Bilandic participated in this decision prior to his election to the Illinois Supreme Court.