THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ANTHONY MURPHY, Defendant-Appellant.

First District (3rd Division) No. 1—90—2851

Opinion filed December 30, 1992.—Rehearing denied March 9, 1993.

Rita A. Fry, Public Defender, of Chicago (Janet Stewart, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Veronica X. Calderon, and Michelle R. Martone, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CERDA delivered the opinion of the court:

After a jury trial, defendant, Anthony Murphy, was convicted of murder and armed robbery. He received concurrent sentences of 55 years' imprisonment for felony murder and 30 years' imprisonment for armed robbery. On appeal, defendant asserts that (1) the State did not meet its burden of rebutting the presumption that conversations between him and his wife were privileged; (2) the trial court erred by allowing the State to improperly cross-examine a defense witness; (3) the State's improper closing argument remarks denied him a fair trial; and (4) the 55-year sentence for murder was excessive. We affirm.

At issue is whether the admission of testimony of the defendant's wife in violation of the statutory marital privilege was prejudicial error.

Prior to the trial, there was a motion to quash arrest and suppress evidence. During those proceedings, Detective James Butler testified that he was contacted by Coretta Murphy on January 18, 1988. She told him that she had information concerning a murder that had occurred in 1986 at 3:30 or 4 a.m. at 77th and Halsted Streets in a vacant lot. Ms. Murphy told Butler that defendant, who is her husband, and his co-worker, Boo, came to her home one night about 4 a.m. They were both covered with blood and were very nervous. When she asked what had happened, defendant answered that they had just killed a man.

After speaking with Ms. Murphy, Butler located the police reports for a homicide that had occurred at a vacant lot at 7726 South Halsted Street at 4:45 a.m. on March 3, 1986. The report indicated

that there were wine bottles found at the scene; the motive appeared to be robbery; no money was found on the victim; no weapon was recovered; and the cause of death was multiple stab wounds and a slashed throat.

Through employment records at Catfish Digby's Restaurant, Butler learned that Boo was Henry Chamblis. On April 7, 1988, Butler showed Ms. Murphy a photo array. She identified Chamblis as Boo. Fingerprints taken from wine bottles recovered from the scene were compared to those of defendant and Chamblis. Fingerprints belonging to Chamblis and Charles Jones, but not defendant, were found on the bottles.

On April 9, 1988, at 5:45 p.m., Butler arrested Chamblis. Initially, Chamblis denied any knowledge of the murder, but after Butler told him about his fingerprint being on the bottle, he named defendant as the killer. Later that evening, defendant was arrested at Catfish Digby's.

During the hearing on the motion to suppress defendant's statements, Butler testified that he advised defendant of his *Miranda* rights after arresting him on April 9, 1988, and again at the Area Two police station, where Butler put defendant into an interview room. Both times defendant stated that he understood his rights.

Butler asked defendant if he wanted to talk to him. After defendant said that he did, Butler had a half-hour conversation with defendant, who then spoke to Assistant State's Attorney Edward McCarthy.

Assistant State's Attorney McCarthy testified that he arrived at the Area Two police station around 11 p.m. on April 9, 1988. There, he spoke with Butler, Higgins, and Ms. Murphy. At 1:30 a.m., McCarthy spoke to defendant and read him his *Miranda* rights. After defendant agreed to talk with McCarthy about the investigation, he gave an oral statement and then a written statement. Later, a court-reported statement was taken from defendant.

The trial court denied the motion to suppress statements, finding that defendant voluntarily gave the statements after he was given his *Miranda* rights.

A pretrial motion *in limine* was made to bar the admission of any spousal conversation between defendant and his wife related to the pending charges. The trial court denied the motion as to those conversations that were in the presence of a third party.

Officer Marilyn Henderson testified that she responded to a call at 5 a.m. on March 3, 1986. When she arrived at 7726 South Halsted Street, she saw a man lying in the middle of a debris-filled vacant lot. The mud around the victim had been disturbed by footprints.

Officer Frank DeMarco testified that he went to the scene at 5:55 a.m. on March 3, 1986. In the vacant lot, he saw two wine bottles next to the victim. DeMarco dusted the bottles for fingerprints. The parties stipulated that the fingerprint examiner would testify that a fingerprint recovered from a bottle belonged to Chamblis.

Coretta Murphy, who married defendant on October 31, 1985, testified that on March 3, 1986, she lived at 7829 South Emerald Street with defendant and her three children. In the early morning, there was a loud knock on the door and the sound of keys turning. When Ms. Murphy opened the door, defendant and Chamblis, whom she knew only as Boo, came in. Both men had bloodstains on their clothes.

According to Ms. Murphy, defendant told her that he thought they had killed someone. When Ms. Murphy asked who the person was, defendant said he did not want to discuss it. Defendant and his wife then went into the kitchen while Boo stood in the living room near the front door. In the kitchen, defendant told Ms. Murphy that he thought he killed a man in a vacant lot near a liquor store at 77th and Halsted Streets, which was a block from their apartment. Defendant said that they attempted to rob the man but he resisted.

According to Ms. Murphy, defendant then showed her a folded hunting knife with a five- or six-inch blade. Defendant asked her to get rid of the knife, which was covered with blood and mud. She handed him some newspaper and told him to dispose of it himself. Defendant broke the knife, wrapped it in the newspaper, and threw it in a dumpster. Then, he changed his clothes and asked his wife to burn them. When she said she was not going to touch anything, defendant put his clothes in a brown plastic garbage bag. Months later, Ms. Murphy took the clothes to the cleaners.

After defendant changed his clothes, Ms. Murphy heard him tell Boo to leave and not to mention anything to anyone. Five to fifteen minutes later, defendant left without telling his wife where he was going.

Months later, defendant told his wife that there was a $5,000 reward for information leading to the conviction of anyone involved in the murder of Brawner, who was a popular entertainer. Defendant told Ms. Murphy and later his sister, "I hope you don't try to turn me in to collect the money." Ms. Murphy testified that she never made any effort to collect the reward and had no intentions of doing so.

On January 18, 1988, Ms. Murphy called the police to report a homicide. She went to the Area Two police station and spoke with Butler. She told Butler that she had information concerning a murder

that took place in February or March of 1986 somewhere between 77th and 78th Streets on Halsted Street. She named defendant and Boo as the killers.

On February 24, 1988, Ms. Murphy again spoke with Butler at the police station. On April 7, 1988, Butler went to Ms. Murphy's home with five photographs. From the photo array, Ms. Murphy identified Boo's picture. At that time, she learned that Boo's name was Henry Chamblis.

Dr. Timothy Chambliss, a forensic pathologist and a deputy medical examiner for Cook County, testified that he performed an autopsy on Brawner's body. Brawner had suffered four stab wounds. All four stab wounds to the left chest perforated organs through the chest wall and the lungs. In Dr. Chambliss' opinion, a four-, five- or six-inch knifeblade could produce these injuries. The cause of death was multiple stab and incision wounds.

At trial, the testimony of Detectives Butler and Higgins was substantially the same as it was during the motion to quash arrest.

Assistant State's Attorney McCarthy testified about defendant's court-reported statement. Defendant stated that he grabbed Brawner from behind and had him in a "Nelson." Chamblis took the money out of Brawner's pants' pockets. Brawner then lifted defendant off his feet. Defendant rocked back on his feet and threw Brawner to the ground. Brawner got up and threw a bottle at defendant, but missed. Chamblis then fell down and Brawner took a poke at him, saying, "It ain't over."

Brawner then swung at defendant, but defendant ducked and pushed him. Defendant said it appeared that Brawner was looking for something with which to fight, but he did not actually see anything in Brawner's hands. Defendant took out his knife, opened it, and ran into Brawner while holding the knife with both hands. He jabbed at Brawner several times as he tried to keep Brawner back. Defendant stated that Brawner was pulling him down by his coat collar. As Brawner pulled defendant down, defendant jabbed him with the knife. Defendant slipped on the mud and both men fell.

As Brawner lay on the ground bleeding, defendant picked up his bag and ran across the street. Chamblis followed, then got on a bus, telling defendant that he would see him at work.

In his own behalf, defendant testified that he is married to Coretta Murphy, and they have one child of their own. Defendant stated that he has a ninth-grade education and had never been previously convicted of any crime. Since 1981, he worked as a cook at Catfish Digby's.

Defendant testified that he did not know where he was on the night of March 3, 1986, but that he was not with Chamblis. He knew Chamblis because they worked together, but they never socialized together. Defendant stated that he did not know, rob, stab, or kill Brawner, but the police made him admit to participating in the incident. Defendant denied telling his wife that he killed someone, ever going home with blood on his clothes, and ever destroying a knife with blood on it.

On cross-examination, defendant testified that his wife never saw Boo at their apartment because defendant never brought him home.

Defendant denied telling the police what happened in the vacant lot on March 3, 1986. Instead, defendant claims that the police fed him the information. Defendant stated that he could write, but could not read very well. He claimed he was not able to read the statement's printed words aloud. He said that he learned to read in grammar school, but could not read certain things.

Defendant did admit, however, that he orally waived his rights before his court-reported statement. Defendant stated that he was not threatened or handcuffed in front of the court reporter. He also stated that the handcuffs were taken off earlier so that he could sign the written statement.

Willie Digby testified on defendant's behalf. He stated that defendant was employed as a cook at one of his restaurants. Defendant began working for him in the early 1980's and left in 1988. On cross-examination, Digby stated that defendant filled out an employment application form when he was hired. To Digby's knowledge, defendant could read and write English.

After deliberating, the jury found defendant guilty of murder and armed robbery. At the sentencing hearing, defendant was sentenced to 55 years' imprisonment for felony murder concurrent with 30 years' imprisonment for armed robbery.

On appeal, defendant asserts that the State did not meet its burden of rebutting the presumption that conversations between him and his wife were privileged. Defendant filed a motion *in limine* to prohibit the State from eliciting testimony from his wife about conversations between them during their marriage. After the State represented to the trial court that the conversations took place in the presence of a third person, the trial court denied the motion.

Defendant contends that the testimony was particularly prejudicial because there was no physical evidence linking him to the murder. Defendant had never been a suspect prior to the time Ms. Murphy

went to the police with the information. Thus, defendant maintains that her testimony, which was crucial, contributed to his conviction.

The State responds that the trial court did not abuse its discretion when it denied the motion. To show that the trial court was cognizant of the nature of the conversation between defendant and his wife, the State quotes its offer of proof at the hearing on defendant's motion *in limine*. In that offer of proof, the State told the trial judge:

> "There are some statements made subsequently out of the presence of the third person. As we have indicated to the Court before, as an offer of proof, we did intend to elicit those statements, but we will abide by the Court's ruling that those statements are not admissible at this point."

In its ruling, the trial court stated:

> "Under all the intended circumstances, there is a third party present. It appears that the prohibition against receiving that type of evidence does not apply ***. There was no intent of privacy. It was not a communication between husband and wife, since the third party was in fact present. I, therefore, find that that does not apply, and the State may use that. *** It is based on the representations that the witnesses would be so testifying *** that there was a third party present when said statement—the State intends to offer presently."

■ In Illinois, a husband and wife cannot testify about confidential communications, admissions, and conversations that occur during marriage. (*People v. Simpson* (1977), 68 Ill. 2d 276, 279; *People v. Burton* (1972), 6 Ill. App. 3d 879; Ill. Rev. Stat. 1987, ch. 38, par. 155—1.) There is a presumption that interspousal communications are intended to be confidential. (*People v. Sanders* (1983), 99 Ill. 2d 262, 267.) If it appears from the circumstances that confidentiality was not intended, the communication will not be regarded as privileged. (*Sanders*, 99 Ill. 2d at 267.) Communications made in the presence and hearing of a third person are generally not considered to be confidential. *Simpson*, 68 Ill. 2d at 280.

■ An act, as well as a statement, can constitute communication. (*Burton*, 6 Ill. App. 3d at 887.) Depending on the nature of the act, it may or may not be confidential. *Burton*, 6 Ill. App. 3d at 887.

While any statement made in the presence of Boo does not come within the marital privilege, any confidential statements made by defendant to his wife while they were alone in the kitchen are privileged. At trial, Ms. Murphy testified that defendant told her in front of Boo that he thought they killed someone. When Ms. Murphy asked who the person was, defendant said he did not want to discuss it.

Defendant and his wife then went into the kitchen while Boo stood in the living room near the front door. In the kitchen, defendant told Ms. Murphy that he thought he killed a man in a vacant lot near a liquor store at 77th and Halsted Streets. Defendant said that they attempted to rob the man and he resisted.

■■ It was improper for the trial court to allow testimony regarding any confidential communications between defendant and his wife made while they were alone in the kitchen. The communications in the kitchen were intended to be confidential and were therefore privileged. There was no evidence Boo was in the kitchen during this conversation. Consequently, the trial court abused its discretion in denying the motion *in limine. People v. Williams* (1990), 205 Ill. App. 3d 715, 724.

In contrast, the statements made in Boo's presence and those regarding the reward money were not intended to be confidential because a third person was present. Since they are not privileged, there was no error in allowing those statements into evidence.

Generally, admission of evidence in violation of the marital privilege that contributes to a guilty verdict constitutes a denial of a fair trial and requires reversal. (*People v. Muzard* (1991), 210 Ill. App. 3d 200, 212.) Where the record shows, however, that the errors complained of did not reasonably affect the result of the trial, the judgment should be affirmed. *Muzard*, 210 Ill. App. 3d at 212.

Ms. Murphy's statements regarding her confidential communications with defendant are harmless error. Without those statements, there was still evidence that he told her on March 3, 1986, that he thought that he and Boo had killed someone. She observed both men were nervous and covered with blood. Ms. Murphy saw defendant with a bloody and muddy knife, which he threw away. Defendant stated to both his wife and his sister that he hoped that they would not turn him in to the police for the reward. In addition, defendant made a statement admitting his guilt. Given this evidence, there was sufficient proof that defendant committed murder beyond a reasonable doubt. The trial court error did not reasonably affect the trial's result.

■ Next, defendant waived his argument that the trial court erred by allowing the State to go beyond the scope of direct examination when it cross-examined Digby about defendant's ability to read and write English. Defendant's failure to raise the alleged error in his post-trial motion constitutes a waiver of that issue. *People v. Enoch* (1988), 122 Ill. 2d 176, 188.

■ Next, defendant asserts that he was denied a fair trial by the State's improper closing argument remarks that there were no other suspects. The State argued that the case was not solved for almost two years, and only after defendant's wife went to the police.

At the end of the State's closing argument remarks, defendant moved for a mistrial based on those remarks. Although the trial judge denied the motion, he advised the jury that there were other suspects in the case. Defendant contends that the trial court's advisement to the jury was not sufficient to cure the prejudice created by the State's argument. In addition, defendant argues, the error was compounded because he was not allowed to present evidence that there were other suspects and that the case had been closed prior to defendant's arrest.

Although admitting that an error occurred during the closing argument, the State asserts that it was cured by the trial court's admonishment to the jury and was harmless in light of the overwhelming evidence of defendant's guilt. We agree.

Although the State cannot argue facts not based on the evidence (*People v. Smith* (1990), 141 Ill. 2d 40, 60), those improper remarks will not merit reversal unless they result in substantial prejudice to the defendant, considering the context of the language used, its relationship to the evidence, and its effect on the defendant's right to a fair and impartial trial. (*Smith*, 141 Ill. 2d at 60.) A mistrial should generally be declared only as the result of some occurrence at trial of such character and magnitude that the party seeking it is deprived of his right to a fair trial. *People v. Redd* (1990), 135 Ill. 2d 252, 323.

■ Finally, defendant asserts that his extended term sentence of 55 years' imprisonment was excessive and improperly based on the statute in effect at the time of sentencing, not at the time of the offense. Defendant maintains that he was not advised of his right to elect to be sentenced under the former law. In 1986, when the murder occurred, the sentencing range for murder was 20 to 40 years. (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(a)(1).) At the time of sentencing, the range for first degree murder was 20 to 60 years. Ill. Rev. Stat. 1989, ch. 38, par. 1005—8—1(a)(1).

Defendant's argument has no merit because the record clearly shows that defendant was in fact sentenced under the former law. Before trial, the trial court advised defendant that he would be sentenced under the former law, which carried a possible sentence of 20 to 40 years' imprisonment. The trial court also informed defendant that under certain circumstances, such as felony murder, the death penalty or natural life in prison was a possible sentence.

After his convictions for murder and armed robbery, defendant waived a jury for the death penalty hearing. During the first phase of the death penalty hearing based on felony murder, the trial court found that defendant qualified for the death penalty because he was the perpetrator of the acts that caused Brawner's death, which occurred during the course of an armed robbery in which defendant assisted by holding Brawner while Chamblis went through his pockets. In addition, the trial court stated, defendant was armed at the time of the offense.

During the second phase of the sentencing hearing, witnesses were presented and arguments in aggravation and mitigation were heard. During its argument, the State remarked that the murder conviction carried a regular term of 20 to 40 years' imprisonment, and an extended term of 40 to 80 years' imprisonment for exceptionally brutal and heinous behavior and/or felony murder.

The trial court sentenced defendant to 55 years' imprisonment for the felony murder conviction, which was committed during an armed robbery, concurrent with 30 years' imprisonment for the armed robbery conviction. In addition, the trial court stated that it considered the death penalty and natural life imprisonment, but found sufficient mitigating circumstances to preclude those sentences.

Based on the foregoing, the circuit court's judgment is affirmed.

Affirmed.

RIZZI and TULLY, JJ., concur.