THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. VICKYE LAYNE, Defendant-Appellant.

Fifth District    No. 5—96—0261

Opinion filed February 28, 1997.

Don W. Ward and Patricia H. Kievlan, both of Pessin, Baird, Wells & Ward, of Belleville, for appellant.

Robert Haida, State's Attorney, of Belleville (Norbert J. Goetten and Stephen E. Norris, both of State's Attorneys Appellate Prosecutor's Office and Kevin Sweeney, of counsel), for the People.

JUSTICE RARICK delivered the opinion of the court:

Defendant, Vickye Layne, was charged in the circuit court of St. Clair County with financial exploitation of an elderly person in viola-

tion of section 16—1.3(a) of the Criminal Code of 1961 (720 ILCS 5/16—1.3 (West 1992)). After a jury trial Layne was found guilty and sentenced to three years' probation. On appeal, Layne argues that the State failed to meet its burden of proof, that she was deprived of her constitutional right against self-incrimination, that the trial court erred in admitting testimony regarding confidential interpersonal communications, and that the trial court erroneously instructed the jury. We affirm.

Prior to trial, Layne filed a motion to suppress several statements she had made to police. At the suppression hearing, Officer Donald Sax testified that he took an oral statement from Layne at Belleville police headquarters on January 19, 1994. Sax interviewed Layne again on March 2, 1994, this time at her home. He took a written statement, which Layne looked at and signed. At the time, Layne mentioned family problems with her son and husband. Detective Joseph Stumpf testified that he took an oral statement from Layne at Belleville police headquarters on May 11, 1994. He reduced this statement to writing, which Layne read and signed. Layne testified that she had not read the statement given to Sax because she needed glasses but did not have any. She signed it after Sax read it to her. She did not read the statement given to Stumpf because she did not have glasses. During the interview with Stumpf, Layne expressed her concern at being away from her grandchildren. Both were having medical problems, and she was caring for them. She argued that such statements were not voluntary because she did not have her glasses and could not read them and because she needed to go home to care for her grandchildren, one of whom had had eye surgery. The trial court found that the statements were voluntary.

At trial Ruth Graswick, the victim, testified that several years after her husband died, she contracted with A-1 Sitters, which provided in-home assistance to elderly clients, to help her with such things as cooking, cleaning, and shopping. One of the women sent by the service was Layne. Graswick testified that she liked and trusted Layne because she was so reliable.

In June 1992, Graswick was admitted to the hospital after sustaining injuries as a result of a fall. Graswick requested Layne to continue visiting her in the hospital. Graswick was subsequently moved to the rehabilitation unit at Rosewood Care Center, and later to the Columbia Convalescent Center, where she remained at the time of trial. Layne continued to visit Graswick at Rosewood.

Graswick gave Layne her checkbook and authorized Layne to write checks to pay Graswick's bills. Graswick also authorized Layne to write herself a check for $1,000 to compensate Layne for various

favors. Graswick specifically stated that she did not authorize Layne to write any other checks to herself. Graswick was unaware that Layne was writing other checks to herself. Following Graswick's entry into a nursing home, Layne continued to purchase items for her, but Graswick maintained that she gave Layne the money to purchase such items. Graswick testified that she began to notice that "things didn't seem to add up" and looked "fishy," and that she asked her nephew, Stephen Jines, to look into it.

Stephen Jines testified that in March or April 1993 he learned that Graswick's account had less than $1,000 in it although it should have contained at least $21,000. He went to the bank and looked at copies of the statements for the previous month or two. Jines noticed considerable activity and obtained copies of the checks drawn on Graswick's account. He noticed that many of the checks were written by and made payable to Layne. When Jines contacted Layne and asked to see her records, Layne claimed they were at the tax return preparer's office. Later, Layne produced some ledgers and receipts but claimed that the checks and check stubs had been stolen. In October 1993, Jines spoke with Officer Donald Sax at Belleville police headquarters. Jines told Sax that Layne had written quite a number of checks, that there was quite a bit of money missing, and that he felt that there was a theft involved. Jines eventually demanded the return of $11,000 but received no response from Layne.

Dr. Timothy Hipskind testified that he was Graswick's attending physician at Rosewood. Graswick was admitted with a diagnosis of compression fracture of the spine, degenerative arthritis, hypertension, and hypothyroidism. Hipskind related the fracture to osteoporosis. He also stated that these conditions were all associated with advanced age. Hipskind also testified that Graswick was on numerous medications, some of which could cause confusion, but that he never observed any signs of confusion or senility, and that Graswick was normally alert and responsive. Hipskind further testified that Graswick was confined to a wheelchair.

Gwenn Flach, the director of nursing at Rosewood, testified that she was the charge nurse at Rosewood while Graswick was there. Flach testified that all Graswick could do for herself was wash her upper torso. She was totally dependent on others for everything else. Flach testified that it took two people to move Graswick from her bed to a wheelchair, and that while Graswick could ambulate with a wheeled walker, she required two people to help provide support. Flach also testified that Graswick was talkative and never exhibited any signs of confusion. To Flach's knowledge, Graswick never left Rosewood.

Edna Bristoe, the former operator of A-1 Sitters, testified that sitters were specifically forbidden to handle client's money. She also testified that Layne had quit shortly after Graswick went into the nursing home.

Carla Pluff, an accountant, testified that Layne asked her to prepare Graswick's 1992 tax returns. Layne claimed to have a power of attorney for Graswick but never produced it. After Pluff filed for an extension, Layne claimed she needed Graswick's tax records and picked them up. Pluff never heard from Layne again.

Walter Layne, Vickye's former husband, testified that they had filed joint tax returns for 1992 and 1993. These returns, signed by Vickye Layne, were admitted into evidence. Walter Layne testified that Vickye would report her income to him and he would report it to a tax preparation service. In both 1992 and 1993 Vickye reported income from a horse farm she owned, and in 1992 she reported income from A-1 Sitter Service. Vickye never reported any income paid to her by Graswick.

Stephen Hampton, a documents examiner with the Illinois State Police, testified that Layne had altered several checks signed by Graswick and made out to Layne so as to greatly increase the amounts of those checks.

Officer Donald Sax took a written statement from Layne at her home on March 2, 1994. In this statement Layne stated that after Graswick entered Rosewood, she stopped using A-1 Sitters, but Layne continued to work for her at an agreed wage of $6.50 per hour. Layne claimed that 33 checks written by Layne, payable to herself, were to pay her salary and reimburse her for items she had purchased for Graswick. She also claimed that most of the receipts documenting her expenses were stolen by her son.

A second statement was taken by Detective Joseph Stumpf at Belleville police headquarters on May 11, 1994. Prior to this statement being taken, Stumpf had used a grand jury subpoena to obtain, from the bank, photocopies of 67 checks totaling $27,152.42 drawn on Graswick's account and payable to Layne. Stumpf testified that Layne went over those checks one by one and admitted converting the proceeds of checks totalling $20,035.12. She claimed that the remaining $7,117.30 was to reimburse her for legitimate expenses. In her written statement Layne reiterated that upon going into the hospital, Graswick had hired her to keep her company, pay her bills, and purchase items for her. Layne admitted writing numerous checks in 1992 and 1993, made payable to herself, and using the proceeds to help improve her horse farm and to meet her own family's needs. She stated that she felt bad about using Graswick's money and felt

that she owed Graswick about $11,000. Layne felt that her salary should be about $5,000 to $10,000. Layne specifically stated that she knew she did not have permission to use Graswick's money for her own purposes. She expressed regret for taking the money and claimed she could make restitution.

Layne called numerous witnesses who testified as to Graswick's mental alertness. Mary Weaver, the social service and admissions director at Rosewood, testified that she never observed Graswick confused or disoriented. Rebecca Schrauth-Fuljham, the social services director at Columbia Convalescent Center, testified that Graswick was confined to a wheelchair and required assistance with dressing, bathing, and going to the bathroom. She found Graswick alert, very talkative, and well oriented to person, place, and time. She testified that Graswick was cooperative and intelligent and had no memory or communication problems and had no problem with her thought process, and that her attention and concentration were good. Several times in 1994 and 1995, Graswick left the nursing home to go shopping and to go out to eat, and she also left once to go to the St. Louis Arch and once to go to the Missouri Botanical Gardens. She testified that when residents went on these "outings," they would go in a van equipped with a lift and a nurse would accompany them.

Layne was found guilty, sentenced to three years' probation, and ordered to make restitution.

On appeal, Layne argues first that the State failed to meet its burden of proof. Specifically, she maintains that the State failed to prove that Graswick was an elderly person as defined by the statute or that a legal or fiduciary relationship existed between herself and Graswick.

■ When the sufficiency of the evidence is challenged on appeal, the appropriate inquiry is " ' "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' " (Emphasis in original.) *People v. Berry*, 198 Ill. App. 3d 24, 28, 555 N.E.2d 434, 437 (1990), quoting *People v. Collins*, 106 Ill. 2d 237, 261, 478 N.E.2d 267, 277 (1985), quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789 (1979). With this standard in mind, we turn to an analysis of Layne's arguments.

■ Section 16—1.3(a) of the Code defines the offense of financial exploitation of an elderly person as follows:

"A person commits the offense of financial exploitation of an elderly person when he stands in a position of trust and confidence

with the elderly or disabled person and he knowingly and by deception or intimidation obtains control over the elderly or disabled person's property with the intent to permanently deprive the elderly or disabled person of the use, benefit, or possession of his property." 720 ILCS 5/16—1.3(a) (West 1992).

Section 16—1.3 requires the State to prove that the defendant (1) stood in a position of trust or confidence with the elderly or disabled person, (2) knowingly and by deception or intimidation obtained control over the elderly or disabled person's property, and (3) did so with the intent to permanently deprive the elderly person of the use, benefit, or possession of his property.

■ Layne argues that the State failed to prove that she stood in a position of trust or confidence with Graswick. What constitutes a position of trust and confidence for purposes of section 16—1.3 is set forth in paragraph (c), which provides:

"(c) For purposes of this Section, a person stands in a position of trust and confidence with an elderly or disabled person when he (1) is a parent, spouse, adult child or other relative by blood or marriage of the elderly or disabled person, (2) is a joint tenant or tenant in common with the elderly or disabled person or (3) has a legal or fiduciary relationship with the elderly or disabled person." 720 ILCS 5/16—1.3(c) (West 1992).

Layne contends that the State failed to produce any evidence of a legal relationship between herself and Graswick and failed to produce clear and convincing evidence demonstrating that a fiduciary relationship existed.

"A fiduciary relationship exists when one person places trust and confidence in another who, as a result, gains influence and superiority over the other. [Citation.] The relationship may arise as a matter of law, such as between agent and principal, or it may be moral, social, domestic, or personal. [Citation.] The factors to consider in determining whether a fiduciary relationship exists between parties *** include the degree of kinship, the disparity in age, health, mental condition, education, and business experience, and the degree of trust placed in the dominant party. [Citation.] The fiduciary is prohibited from seeking a selfish benefit during the relationship. When the fiduciary relationship does not arise as a matter of law, it must be proved by clear and convincing evidence. [Citation.]" *Kurtz v. Solomon*, 275 Ill. App. 3d 643, 651, 656 N.E.2d 184, 190-91 (1995).

In *In re Estate of Glogovsek*, 248 Ill. App. 3d 784, 618 N.E.2d 1231 (1993), this court held that a fiduciary relationship arises where one person entrusts another with the management of property or money. *Glogovsek*, 248 Ill. App. 3d at 792, 618 N.E.2d at 1238. It is

uncontested that Graswick gave Layne her checkbook so that Layne could pay Graswick's bills. Further, Graswick was in her late 70s, while Layne was in her mid-40s. Graswick's health was such that she was confined to a nursing home, dependent upon others to help her with basic life functions such as bathing and getting out of bed. As the owner and operator of a horse farm, Layne possessed business skills and expertise. Finally, Graswick testified that she placed complete trust in Layne. We find that the State produced clear and convincing evidence from which a rational trier of fact could find that a fiduciary relationship existed between Layne and Graswick.

■ Layne next argues that the State failed to prove that Graswick was an "elderly person." The statute defines an "elderly person" as:

"a person 60 years of age or older who is suffering from a disease or infirmity associated with advanced age and manifested by physical, mental or emotional dysfunctioning to the extent that such person is incapable of avoiding or preventing the commission of the offense." 720 ILCS 5/16—1.3(b)(1) (West 1992).

To prove that Graswick was an "elderly person" for purposes of the statute, the State was required to prove (1) that Graswick was 60 years of age or older, (2) that she suffered from a disease or infirmity associated with advanced age, (3) that such disease manifested itself by physical, mental, *or* emotional dysfunction, and (4) that as a result of such dysfunction the person was incapable of avoiding or preventing the offense.

Layne argues at length that her conviction cannot be sustained because the evidence demonstrates that Graswick did not suffer from any mental impairment. No such showing is necessary, however. The use of the disjunctive in the phrase "manifested by physical, mental *or* emotional dysfunctioning" (emphasis added) demonstrates that the disease or infirmity associated with advanced age need manifest itself in only one of those ways.

Dr. Hipskind testified that Graswick suffered a compression fracture of the spine and suffered from degenerative arthritis, hypertension, and hypothyroidism. He also testified that these conditions were typical in a person of Graswick's advanced age. Defendant offered no testimony to rebut this contention. Finally, Hipskind testified that Graswick was confined to a wheelchair. Gwenn Flach testified that it required two people to move Graswick from the bed to a wheelchair, that it took two people to help her shower, and that while Graswick could ambulate with a wheeled walker, it took two people to assist her. Flach testified that Graswick was totally dependent "on someone getting her in bed, out of bed, putting her on the toilet, [and] taking care of her hygiene needs." She stated, "She's de-

pendent on everything ***." Layne contends that Schrauth-Fuljham's testimony demonstrates that Graswick was not so physically impaired that she could not prevent the crime. The jury was entitled to accord this testimony little weight, as it apparently did, because the offense in question took place while Graswick was at Rosewood and Schrauth-Fuljham did not meet Graswick until she was transferred to Columbia.

Layne next argues that the trial court erred in allowing her statements to the police to be published to the jury. She maintains that such statements did not constitute confessions because all of the elements of the offense are not included therein. She further argues that even if the statements were confessions, they are insufficient to support a conviction because the *corpus delicti* has not been corroborated by the evidence.

■ Reviewing the record, we find that at no time did the State argue that either statement was a confession, even though the second statement was so incriminating that it could fairly be characterized as such. Any statement by an accused person, unless excluded by the privilege of self-incrimination or other exclusionary rules, may be used against him as an admission. *People v. Aguilar*, 265 Ill. App. 3d 105, 110, 637 N.E.2d 1221, 1224 (1994). Although Layne contends that these statements violated her privilege against self-incrimination, she advances no argument in support of that contention. Points raised in a brief but not argued or supported by citation to relevant authority are waived. *People v. Franklin*, 167 Ill. 2d 1, 20, 656 N.E.2d 750, 758 (1995). The trial court found the statements to have been made voluntarily, and Layne does not challenge that finding on appeal. We find the statements to have been properly admitted.

Layne next argues that the trial court erred in permitting Walter Layne to testify about confidential communications that occurred during their marriage. She maintains that any acts and conversations between her and Walter Layne regarding employment and wages were confidential in nature and protected by marital privilege.

■ In Illinois, a husband or wife may testify for or against each other in criminal cases, provided that neither may testify as to any communication or admission made by either of them to the other or as to any conversation between them during the marriage. *People v. Muzard*, 210 Ill. App. 3d 200, 212, 569 N.E.2d 26, 32 (1991). The privilege applies where communications were intended to be of a confidential nature. *People v. Foskey*, 136 Ill. 2d 66, 89, 554 N.E.2d 192, 203-04 (1990), citing *People v. Sanders*, 99 Ill. 2d 262, 457 N.E.2d 1241 (1983); *People v. Gardner*, 105 Ill. App. 3d 103, 433 N.E.2d 1318

(1982). There is a presumption that interpersonal communications are intended to be confidential, but if it appears from the circumstances that confidentiality was not intended, the communication will not be regarded as privileged. *People v. Murphy*, 241 Ill. App. 3d 918, 924, 609 N.E.2d 755, 760 (1992). Thus, communications made in the presence of a third person are generally not considered to be confidential. *People v. Simpson*, 68 Ill. 2d 276, 280, 369 N.E.2d 1248, 1251 (1977).

While Vickye Layne's transmittal of income and expense information to Walter Layne was not made in the presence of a third person, it was clearly done in contemplation that such information would be transmitted to a third person. The circumstances demonstrated that the communications in question were not intended to be confidential and therefore are not privileged.

Further, even if Walter Layne's testimony was in violation of the marital privilege, any error was harmless. Walter Layne testified that when Vickye gave him information about her income for tax return preparation purposes, she did not report any income from Ruth Graswick. The Laynes' 1992 and 1993 tax returns, signed by Vickye Layne and admitted into evidence as People's exhibit 5, provide the same information. The returns show that Vickye Layne reported income from her horse farm and from A-1 Sitters but did not report any income from Ruth Graswick. A violation of the marital communication privilege is harmless when the same facts are proved by other evidence. *Muzard*, 210 Ill. App. 3d at 213, 569 N.E.2d at 33.

Finally, Layne argues that the trial court erred in allowing the addition of paragraph 6 of Illinois Pattern Jury Instructions, Criminal, No. 13.33E (3d ed. 1992) (hereinafter IPI Criminal 3d), which provides various definitions for the term "deception."

■ Defendant's proposed instruction No. 5 included only paragraph 1 of IPI Criminal 3d No. 13.33E, which defines "deception" as knowingly:

"creat[ing] or confirm[ing] another's impression which is false and which the defendant does not believe to be true." IPI Criminal 3d No. 13.33E.

The State moved to include paragraph 6, which defines "deception" as knowingly:

"misrepresent[ing] or conceal[ing] a material fact relating to the terms of a contract or agreement entered into with [(an elderly) (a disabled)] person or the existing or preexisting condition of any of the property involved in such contract or agreement." IPI Criminal 3d No. 13.33E.

The trial court added paragraph 6 over Layne's objection.

Layne argues that there was no evidence of any contractual relationship between herself and Graswick, and that the inclusion of paragraph 6 was therefore improper.

It is well settled that both the State and the defendant are entitled to appropriate instructions on any theory of the case that is supported by the evidence. *People v. Sims*, 244 Ill. App. 3d 966, 1008, 612 N.E.2d 1011, 1042 (1993). Layne claimed in both written statements that she had entered into a contract with Graswick. This evidence would support a theory that Graswick had agreed to pay Layne a salary and that Layne had deceived Graswick by taking far more from Graswick's account than she was entitled. The definition of deception provided in paragraph 6 was supported by the evidence and properly given.

For the foregoing reasons, the judgment of the circuit court of St. Clair County is affirmed.

Affirmed.

WELCH and MAAG, JJ., concur.